MOORE *v.* CAPITAL NATIONAL BANK OF LANSING.

1. Banks and Banking—Contracts—Indemnity—Guaranty.

Contract whereby plaintiff and cross-plaintiffs, directors of bank in distressed financial condition, as primary obligors, and other parties not directly interested, as secondary obligors, agreed to save harmless defendant bank, which took over assets and assumed obligations of distressed bank, from any loss in performance of the contract *held,* one of indemnity rather than of guaranty notwithstanding reference to plaintiff and cross-plaintiffs as guarantors where its purport was wholly one of indemnity and it was an original, not a collateral, agreement.

2. Indemnity—Guaranty—Number of Parties.

A contract of indemnity differs from one of guaranty in the number of parties required, the former requiring indemnitor and indemnitee while the latter requires a principal, obligee and guarantor.

3. Same—Guaranty—Nature of Contracts.

A contract whereby an indemnitor undertakes to save indemnitee against loss arising from an unknown or contingent event is one of insurance while a contract of guaranty is a form of suretyship.

4. Same—Fraud—Pleadings—Evidence.

In indemnitors' suit to set aside contract of indemnity, release them from further liability thereunder and return of securities deposited by them on ground of fraud, trial court's dismissal of charges of fraud *held,* correct under pleadings and evidence presented.

5. Evidence—Judicial Notice—Dormant Bank Accounts.

Court takes judicial notice that in a large bank there are always a large number of depositors who hold dormant accounts and who have either moved away, died or forgotten small bank balances.

6. BANKS   AND   BANKING—EQUITY—INDEMNITY—CONTRACTS—SUB-
STANTIAL PERFORMANCE—NOVATION.

On defendant bank's claim of performance by novation as to de-
posits of bank whose assets it took over and whose deposit lia-
bility it assumed, where all depositors were afforded an oppor-
tunity and a large percentage of the deposit liability was
novated, whether or not there was a complete novation is not
decided but evidence does show sufficient performance by de-
fendant as to render its indemnitors not entitled to return of
collateral security.

7. SAME—INDEMNITY—COLLATERAL—RECEIVERS.

In suit by indemnitors of defendant bank, which took over assets
and assumed deposit liability of distressed bank, for return of
collateral security, that defendant bank closed about 13½
months later and subsequently went into receivership instead of
continuing as a going concern *held*, not to entitle indemnitors
to return of security where a large part of the assets remain
unliquidated in the absence of a showing receiver had acted
improperly since it is assumed he is interested in securing the
utmost for depositors.

8. SAME—INDEMNITY—INJUNCTION AS TO SALE OF COLLATERAL.

Indemnitors of defendant bank which agreed to take over assets
and assume deposit liability of distressed bank *held*, entitled to
injunction restraining sale of collateral deposited with indem-
nitee pending judicial determination of legal liability for a loss
and its amount.

9. RECEIVERS—NATIONAL BANKS—ADMINISTRATIVE OFFICER—DUTIES.

Statutory receiver of a national bank is an administrative officer
selected by the comptroller and is an agent and officer of the
United States to take possession of the books, records and
assets of every description (12 USCA, § 192).

10. BANKS AND BANKING—NATIONAL BANKS—CONTROL.

National banks are instruments of the United States and are not
subject to any control or supervision by the State except as per-
mitted by congress.

11. SAME—COMPTROLLER—DUTIES AS TO RECORDS OF INSOLVENT NA-
TIONAL BANKS.

The comptroller has entire control of an insolvent national bank
for the evident purpose of speedily winding up its affairs re-
gardless of the wishes of the stockholders, is not an officer of

the court but an agent of the United States and, as such, is subject to treasury department rule that records and papers desired in a suit should be furnished to court only and then only upon rule of court requesting same from treasurer.

12. APPEAL AND ERROR—MOOT QUESTION—NATIONAL BANK RECEIVER —SUBPŒNA DUCES TECUM.

Granting motion to quash subpœna *duces tecum* issued to receiver of defendant national bank on ground of lack of power to compel his attendance with books and papers set forth therein *held*, moot question in suit by defendant's indemnitors for return of collateral, where comptroller later furnished substantially all information asked for therein and evidence would have related to an immaterial issue in view of fact that defendant afforded opportunity for complete, and gave substantial, performance of its contract to assume deposit liability of distressed bank and further fact of lapse of 13½ months before defendant was forced to close its doors.

13. COSTS—RELIEF FIRST PRAYED FOR ON APPEAL.

Defendant *held*, entitled to costs where relief given on appeal in equity case was first prayed for in Supreme Court.

Appeal from Ingham; Searl (Kelly S.), J., presiding. Submitted June 18, 1935. (Docket No. 65, Calendar No. 38,407.) Decided January 6, 1936.

Bill by Harry E. Moore against Capital National Bank of Lansing, Nathan Hull, its conservator, and Richard H. Scott and others to set aside a contract, return collateral securities and for other relief. Cross-bills by defendant Richard H. Scott and others against defendant bank and its conservator for similar relief. Bill and cross-bills dismissed. Plaintiff and cross-plaintiffs appeal. Decree set aside and cause remanded with instructions to issue injunction.

*Cummins & Cummins*, for plaintiff and cross-plaintiffs Detroit Trust Company and Bessie Reasoner, co-executors of the will of Benjamin F. Davis, deceased, and Central Trust Company and M. Catherine Knapp, executors of the will of Joseph W. Knapp, deceased.

*Shields, Silsbee, Ballard & Jennings,* for defendants.

*Charles E. Ecker,* for cross-plaintiff Olds.

*Fred L. Warner,* for cross-plaintiff Scott.

*Foster & Cameron,* for cross-plaintiff Reo Motor Car Company.

*H. R. Martin,* for cross-plaintiffs Wilford and Motor Wheel Corporation.

BUTZEL, J.   On November 16, 1931, in a written communication to the board of directors of the City National Bank of Lansing, Michigan, the comptroller of the United States treasury department directed their attention to the very serious condition of the bank as disclosed by the report made the previous month.   He commented on the very large losses in the bond department, an estimated loss of $713,574.77 in loans and discounts, the wiping out of the surplus, undivided profits, and reserve for contingencies and the impairment of almost one-half of the bank's capital of $500,000.   He most severely criticized the negligent manner in which the bank's affairs had been conducted and the fact that a large part of the assets consisted of an investment in a new building and equipment, the total cost of which, when completed, would be $900,000, almost twice the amount of the bank's capital.   He stated that the directors would be called to a strict accountability for any misconduct.   On December 21, 1931, approximately one month later and after the depression had possibly made further inroads into the value of the bank's assets, the bank found itself in a precarious condition.   A large part of its assets were frozen, $738,981.01 being represented in its statement by the value of the banking house, real estate,

furniture and fixtures. The value of the collateral on some of the loans had depreciated 90 per cent. The situation was grave and insolvency imminent unless immediate assistance would be forthcoming. There had been a "run" on the American State Bank of Lansing, which closed its doors on December 22, 1931. One was threatened on the City National Bank. Citizens of Lansing, some interested in the City National Bank, others in the Capital National Bank, of the same city, and some in other banks and large manufacturing institutions were apprehensive of the effect of a failure of the City National Bank upon the other banks, its depositors and the city in general. On December 24, 1931, and the following two days, conferences between representatives of the City National Bank and the Capital National Bank culminated in a request by the City National Bank for assistance, and in pursuance thereof an agreement was entered into by which the Capital National Bank agreed to take over the assets and assume and perform all deposit obligations and other liabilities of the City National Bank. The plaintiff and cross-plaintiffs severally and mutually in the manner and to the extent set forth in the contract guaranteed and agreed to save harmless the Capital National Bank against all loss through taking over the assets and performing the deposit and other obligations of the City National Bank. Liquidation was to be conducted in the manner to be determined from time to time in the sole discretion of the Capital National Bank. The liability of the indemnitors was to continue irrespective of any change or modification of the original agreement and any action by the Capital National Bank as between it and the City National Bank or its stockholders and any of the other indemnitors.

While the indemnitors were referred to as "guarantors" in the agreement and did "guarantee" the Capital National Bank against loss, the purport of the agreement was wholly one of indemnity, notwithstanding the fact that appellants are referred to as "guarantors" in the agreements. The contract was an original and not a collateral agreement and differs from a contract of guaranty or suretyship. The contract of guaranty or suretyship requires three parties, the principal, the obligee and the guarantor or surety. One of indemnity requires two parties, the indemnitor and the indemnitee. The indemnitor undertakes to save the indemnitee against loss arising from an unknown or contingent event. The contract of indemnity is one of insurance. A contract of guaranty is a form of suretyship. See Stearns, Law of Surety (4th Ed.), footnote p. 37; *Hall* v. *Woodin,* 35 Mich. 67. In the instant case the "guarantors" were not to answer for the payment of a debt of another, but were to indemnify the Capital National Bank for any loss in connection with the performance of the contract.

This indemnity contract, in the amount of $1,500,000, was entered into by B. F. Davis, R. H. Scott, J. W. Knapp, J. W. Wilford and H. E. Moore, directors of the City National Bank, who became primary indemnitors, and by R. E. Olds, Reo Motor Car Company and Motor Wheel Corporation, who became secondary indemnitors. The primary indemnitors severally either deposited or agreed to transfer to the Capital National Bank securities valued at $750,000. The secondary indemnitors agreed to be responsible in the aggregate amount of $750,000 in the event that sufficient was not realized from the securities deposited by the first indemnitors. In case of loss, recourse was to be had

first to the securities deposited by the primary indemnitors and any excess was to be paid out of the collaterals of the secondary indemnitors in the amount of their several liabilities. It was further agreed that should the Capital National Bank or its indemnitors suffer any loss in connection with the assumption of the deposit or other liabilities of the City National Bank, there should be preserved to the Capital National Bank or its indemnitors all rights of statutory or other assessment against the stockholders of the City National Bank. The primary indemnitors were directly interested in the salvaging of the City National Bank. They, with the exception of Davis, were sureties on a bond given to the treasurer of the city of Lansing in the amount of $325,000 and to the board of education of Lansing in the amount of $250,000. All of them, with the exception of Scott, were sureties on a bond given to the county of Ingham in the amount of $600,000. There was also a large deposit by the treasurer of the State of Michigan, but the record does not disclose any facts in regard to a depository bond. On December 26, 1931, the public moneys on deposit in the City National Bank amounted to $331,932.84. The primary indemnitors owned over 10,000 shares of stock in the City National Bank. The secondary indemnitors had no direct interest in the City National Bank. An additional agreement was entered into by the Reo Motor Car Company, Motor Wheel Corporation and General Motors Corporation to make time deposits of not less than $2,000,000 for one year with the Capital National Bank. While the exact financial condition of the City National Bank on December 26, 1931, is not shown with certainty, the testimony indicates that the liabilities exceeded the assets, a very large part of which were

frozen. The trial judge found a very large deficit at the time the assets were taken over.

The Capital National Bank belonged to the Guardian Detroit Union Group, Incorporated, a holding company, owning all or a substantial part of the stock in a large number of financial institutions in the State of Michigan. Its president and attorney took an active part in the negotiations. The exact condition of the Capital National Bank on December 26, 1931, is not shown but evidently it was in good condition for it remained open until closed by the governor's proclamation on February 14, 1933. During that time it met all its obligations and was subjected to the regular examinations of national bank examiners. Its statement showed capital and surplus and undivided profits of almost $1,700,000, though its assets must have been affected by the depression. The agreement provided that the Capital National Bank was to receive six per cent. on the deposit liability of the City National Bank for its services, but the latter was to be credited with all interest earned on the assets turned over to the Capital National Bank.

Upon the consummation of the agreement, the books and papers of the City National Bank were immediately moved to the banking offices of the Capital National Bank in the Olds Tower Building in Lansing and the following day depositors were notified both by letter and by public advertisement of the taking over of the bank. The Capital National Bank at once withdrew the 90-day notice that the City National Bank had exacted from savings depositors seeking to withdraw their money. A large amount was withdrawn by depositors the day following the taking over of the bank by the Capital National Bank, but shortly thereafter the excitement sub-

sided. All demands of depositors were promptly met and liquidation of the City National Bank assets proceeded in an orderly manner. The Capital National Bank gave the same consideration to the assets of the City National Bank as it did to its own. It was a time when the obligations, notes and all other assets had to be carefully nursed in view of the impoverished condition of many of the borrowers and the depreciated value of the real and personal property securing the loans. The Capital National Bank did not reopen after February 11, 1933. Subsequent to the president's proclamation of March 6, 1933, declaring a bank holiday on account of the financial crisis, first a conservator and then a receiver were appointed by the comptroller of the currency for the Capital National Bank. Dividends of 43 per cent. have thus far been paid on depositors' accounts as they stood at the time the bank was closed.

On February 23, 1933, Harry E. Moore, one of the primary indemnitors, filed a bill of complaint against the Capital National Bank and Nathan Hull, conservator, and also against all of the other primary and secondary indemnitors who in turn filed cross-bills. They charge a failure of consideration because of the fact that the depositors have not been paid in full, and further, that the agreement contemplated an orderly liquidation by a going bank and not by a receiver. They seek to have the agreement set aside and held for naught and ask for a release from all further liability thereunder and a return of all securities deposited by them. The trial judge held that it would be grossly inequitable at this time to grant the relief prayed for after the extent to which the deposit obligations had been performed by the Capital National Bank. He dismissed the bills of complaint without prejudice to the rights that the plaintiffs might have to bring subsequent

proceedings upon the completion of the liquidation. He intimated that there might be further dividends. Plaintiff and cross-plaintiffs have appealed from the order dismissing the bill and cross-bills.

The claim is made by three of the indemnitors that the agreement was entered into through false representations as to the strength of the Capital National Bank. We do not find such fraud charged in the cross-bills of complaint nor except in a general way in the original bill of complaint, nor do we find any fraud proven by the record. The only charge in the bill of complaint is that the Capital National Bank fraudulently represented itself to be solvent. Testimony was offered to show that the president of the Guardian Detroit Union Group, Incorporated, also made representations of its vast resources which could be invoked in case of financial distress of one of its member banks. Notwithstanding the fact, as shown by a special record taken in accordance with 3 Comp. Laws 1929, § 14159, that many of the banks in the Guardian Detroit Union Group, Incorporated, displayed weakness instead of strength, we do not believe fraud was shown. The judge was correct in dismissing the charges of fraud.

It is claimed that the indemnitors are released because the Capital National Bank failed to perform its part of the bargain. Indemnitors claim that the Capital National Bank did not pay the depositors off as it had contracted to do. The obligation of the Capital National Bank was to "assume and perform" the obligations of the City National Bank. There can be no question but that the agreement did not contemplate that the depositors of the City National Bank would immediately withdraw their accounts or that the Capital National Bank was immediately to pay them off in full without their asking. It is true that the Capital National Bank after it

closed could not pay off the depositors on their demand. The record indicates that if the rule of first in and first out be applicable, approximately 62 per cent. of their deposits had been paid out to the former depositors of the City National Bank by the Capital National Bank prior to its closing. Further dividends of 43 per cent. of the remainder have been paid out as dividends since the bank's closing; so that up to the present time there is a strong showing that depositors have been paid approximately 78 per cent. of the deposit liability. The exact amount need not be determined at the present time.

Defendants claim that there was further performance of their contract to assume and perform by virtue of a novation releasing the City National Bank from any deposit liability. The total amount of deposit liability the Capital National Bank took over amounted to $6,231,372.95. Of this sum all of the depositors except those who held accounts aggregating $139,000 transacted business with the Capital National Bank during the period from December 26, 1931, up to the time the bank closed. They did this either through deposits and/or withdrawals, acceptance of monthly statements, etc. On February 11, 1933, depositors holding accounts aggregating $139,000 had not transacted any business with the Capital National Bank as their debtor. The holders of approximately $100,000 of this latter amount have accepted dividends amounting to $42,766.07 from the receiver of the bank. While it is claimed that the latter also filed claims, the record is not clear. However, there has been no action or payments made on $39,000 of deposits. This is less than one per cent. of the total deposits that were taken over. The court will take judicial notice that in a large

bank there are always a large number of depositors who hold dormant accounts and who have either moved away, died or forgotten small bank balances. It is urged that the following rule in *Gillett* v. *Ivory,* 173 Mich. 444, which involved an analogous situation, be applied:

"The necessary legal elements to establish a novation are (1) parties capable of contracting; (2) a valid prior obligation to be displaced; (3) the consent of all the parties to the substitution; and (4), lastly, the extinction of the old obligation and the creation of a valid new one. The first and second of these elements are conceded to exist. As to the third, it appears conclusively that the defendants and Hagle and Varran agreed to the substitution, and we think it is demonstrated that plaintiff likewise so agreed. If he did so, the fourth element follows as a matter of law. Ample consideration for the novation is found in the transfer of the fund to Hagle and Varran, their undertaking to pay plaintiff, and his assent thereto. * * *

"Plaintiff's conduct after he learned of the sale and after the insolvency of the bank should be held to *estop* him from now claiming that he did not assent to the novation.

"Relying upon such assent, defendants took no steps to protect themselves under their contract with Hagle and Varran. Indeed, while plaintiff was asserting that Hagle and Varran were his debtors, they were unable to do so. Now that he finds that Hagle and Varran are financially unable to pay his claim in full it is too late for him to change his position, and compel defendants to respond at a time when they cannot protect themselves."

However, we do not think that the claim of novation as to the City National Bank depositors need be decided until we have all the facts before us. It only need be mentioned as indicating one of the methods

employed by the Capital National Bank in performing the contract. It is sufficient to say that, taking into account the fact that a great amount of the deposit liability of the City National Bank has been novated, the payments actually made by the bank while it was in operation and subsequent to its closing, the fact that the bank for a period of approximately 14 months paid in full all City National Bank depositors who made demand for their money, and afforded all others an opportunity to be paid in full on demand—there has been a sufficient performance of the contract so that the indemnitors cannot now ask for a return of their collaterals.

It is further contended by indemnitors that the involuntary closing of the bank by the government and the failure of the bank to re-open, constitute a distinct breach of contract, for it was contemplated at the time that the liquidation would be carried out by a sound, going bank in a careful manner so as to realize the utmost from the collateral and the assets. The liquidation proceeded in an orderly manner for 13½ months up to February 11, 1933. The closing of the Capital National Bank was not voluntary and the appointment of a conservator and subsequently a receiver was not by a court but by the comptroller of the currency. The agreement further provided that the assets transferred to the Capital National Bank were to be handled, liquidated and disposed of as might be determined from time to time in the sole discretion of the Capital National Bank. It cannot be assumed that the assets would be held forever nor that the receiver working under the United States treasury department would not act in the interest of the depositors. There is no showing whatsoever that the receiver had acted improperly. He has full power to dispose of the assets and collateral and it may be assumed that he is interested in secur-

ing the utmost for the depositors. We cannot find an exactly similar situation in the cited authorities. The trial court relied largely on the case of *Assets Realization Co.* v. *Roth,* 226 N. Y. 370 (123 N. E. 743), in which Judge Cardozo, speaking for the court, stated:

"The defendant argues that the dissolution of the German Bank was equivalent to a voluntary abandonment of the task of liquidation (*People* v. *Globe Mut. Life Ins. Co.,* 91 N. Y. 174). * * * We think there is nothing in the point. The bank did not seek dissolution, ridding itself of its agreement as of some vexatious burden. Dissolution was forced upon it by the action of the State. The result did not cease to be involuntary because insolvency may have been due to negligence or other wrong (*People* v. *Globe Mut. Life Ins. Co., supra*). Mistakes, with corporations as with men, are often paid for in shortened lives. But error is not suicide."

It is true that in the *Assets Realization Company Case* the liquidation had almost been completed whereas in the instant case a large part remained to be liquidated. The appellants stress the case of *Central Trust Co.* v. *Chicago Auditorium Association,* 240 U. S. 581 (36 Sup. Ct. 412, L. R. A. 1917B, 580). That case involved service of such a personal nature that it could not be performed by others. A case similar to the instant one is that of *State-Planters' Bank & Trust Co.* v. *First National Bank of Victoria* (C. C. A.), 76 Fed. (2d) 527, where the facts bear much similarity, the court saying:

"That all the parties, at the time of the making of the contract, expected that the liquidation would be carried on and completed by the National Bank as a going concern, is not to be doubted; yet it is hard to see how the placing of the National Bank in the hands of a receiver had any damaging effect

upon the liquidation of the State Bank which was proceeded with by the receiver, who was duly appointed in pursuance with the national banking laws, and had all the powers that the bank would have had. In any event this condition was a subsequent one and the authorities are clear that a condition subsequent, to be effective, must be set out in the written instrument itself. Here we have a transaction called out under an agreement admittedly complete and in operation; a vital feature of the agreement was the giving of the bond; the execution and delivery of the bond at the time the agreement itself was delivered is admitted; the National Bank would evidently not have entered into the transaction except for the reliance placed upon the bond; and there is no allegation of bad faith on the part of the National Bank or its receivers. Under all these circumstances we are of the opinion that the bond did become effective and that the defendants became liable thereon.''

However, the issue in the instant case is not the same as those in the cases cited. Here we are faced with only the question ''Are the collaterals of the indemnitors to be returned to them?'' We do not decide what rights the Capital National Bank has in this collateral except that the receivership is no justification for the return of the collateral. It may well be that on a final accounting the receivership of the Capital National Bank will be a benefit to the indemnitor and not an injury. But a decision as to the effect of the receivership and the amount the Capital National Bank can claim out of the collateral, if it pays less than 100 per cent. to the former depositors of the City National Bank, and many other kindred questions cannot be given in this case as the record and briefs do not call for it nor is the time yet ripe. Defendants claim that, in case the City National Bank assets, on liquidation, do not

produce an amount equal to the total of the City National Bank liability assumed by the Capital National Bank, regardless of how much thereof the latter actually shall pay, they will be entitled to sell the securities deposited by indemnitors to cover such "loss." Again, this should be determined when the facts occur. In view of the claim of defendants and the apparent difficulties which appear in the offing, as bearing upon the question of loss and liability, we hold that appellants, instead of having their bills and cross-bills dismissed, are entitled to the preservations of the securities in *status quo* and injunction restraining their sale until legal liability for a loss and its amount has been judicially determined.

The most serious question in the case arose through the judge's granting a motion to quash a subpœna *duces tecum* issued to the receiver and further excluding the testimony of the employees of the receiver in relation to the books and records held by the receiver. A statutory receiver is an administrative officer selected by the comptroller and an agent and officer of the United States. National banks are instruments of the United States and are not subject to any control or supervision by the State except as permitted by congress. A receiver is appointed and directed by statute to take possession of the books, records and assets of every description of the national bank. 12 USCA, § 192. The comptroller has entire control of an insolvent bank for the evident purpose of speedily winding up its affairs regardless of the wishes of the stockholders. He is not an officer of the court but an agent of the United States. *Hulse* v. *Argetsinger,* 12 Fed. (2d) 933. Section 22, 5 USCA (Rev. Stat. § 161), provides:

"The head of each department is authorized to prescribe regulations, not inconsistent with law, for

the government of his department, the conduct of its officers and clerks, the distribution and performance of its business, and the custody, use, and preservation of the records, papers, and property appertaining to it.''

The treasury department Rule No. 9 provides as follows:

"Rule 9. No account, document, or paper of any kind shall be withdrawn from the files of the department by agents, attorneys, or other persons; and copies of any accounts or papers shall not be furnished to any person except upon the written order of the secretary, one of the assistant secretaries, or head of bureau, and such copies shall be furnished only to such persons as may have a personal material interest in the subject matter of the papers. An affidavit setting forth the interest of the applicant and showing the purpose for which copies are desired must be submitted with each application.

"In all cases where copies of documents, or records are desired by, or on behalf of, parties to a suit, whether in a court of the United States or any other, such copies shall be furnished to the court only, and on a rule of the court upon the secretary of the treasury requesting the same. Exceptions to this rule will be made only on the written order of the secretary or of an assistant secretary.

"No information in regard to transactions of an official character in this department is to be communicated to anyone not authorized to receive the same."

The subpœna was so all inclusive as to ask for practically all books and records including a complete schedule of the assets and liabilities of the Capital National Bank as of December 26, 1931, and the entire history of the liquidation, the minutes of the meetings of the directors of the Capital National

Bank and their discount committee from January 31, 1929, down to date, etc. The receiver moved to quash the subpœna in accordance with instructions from the comptroller of the currency of the treasury department. In his motion he called attention to Rule No. 9 of the treasury department which was promulgated in accordance with 5 USCA, § 22. The comptroller did not refuse copies of documents if the request was made for them by a rule of court.

The court ruled that it was without power to compel the attendance of the receiver with the books and papers set forth in the subpœna and in conformity with this ruling he further excluded testimony of employees of the receiver. After much heated discussion and denunciation of the rule by the attorney for plaintiff and certain cross-plaintiffs, a request was made of the treasury department to give practically all the information asked for except such as related to the condition of the Capital National Bank as of December 26, 1931. We appreciate the importance of the questions thus raised by the action of the trial judge and the desirability of a final ruling on the question by the United States Supreme Court. But the comptroller subsequently did give substantially all the information asked for or necessary to decide the issues in the case on a rule of court subscribed by attorneys for defendants. The question thus becomes moot and it is not necessary for any further judicial determination in the instant case. The solvency of the Capital National Bank did not become material in view of its performance of the deposit liability and the further fact that such a long time elapsed after December 26, 1931, before the Capital National Bank was forced to close its doors. We can appreciate that the liquidation of a bank through an officer appointed by the Federal government should

not be interfered with, but, on the other hand, the necessity of giving full information in regard to all matters in litigation arising out of transactions between the bank and other parties may arise. The question loses its importance in the instant case, however, and we shall pass it.

The decree will be set aside and the cause will be remanded to the circuit court in chancery to retain jurisdiction over the cause and parties and with directions to issue an injunction restraining defendants from disposing of the securities except upon the order of the court.

As the relief here granted appellants was not prayed in circuit court, but was first asked in this court, defendants will have costs.

NORTH, C. J., and FEAD, WIEST, BUSHNELL, EDWARD M. SHARPE, and POTTER, JJ., concurred.

The late Justice NELSON SHARPE took no part in this decision.