SMITH v SAGINAW SAVINGS & LOAN ASSOCIATION

Docket No. 78-2595. Submitted June 21, 1979, at Lansing.—Decided December 6, 1979.

Plaintiffs Joseph D. and Mary Ann Smith contracted with Docter Building Co. (Docter) for the construction of a summer home. The Smiths arranged a construction loan with defendant, Saginaw Savings & Loan Association (Saginaw), through Mr. Sauer, Saginaw's Gaylord branch manager. During construction Docter purchased material for use on the Smith job, other jobs financed by Saginaw and other jobs not financed by Saginaw from plaintiff Great Lakes Sales & Distributing, a partnership. Before completion of construction of the Smith home, the builder filed bankruptcy. Plaintiffs filed suit against defendant in the Otsego Circuit Court for alleged breach of contract. After a jury verdict for plaintiffs, the court, William A. Porter, J., denied defendant's motion for judgment *non obstante veredicto* or a new trial and entered a judgment for plaintiffs. Defendant appeals. *Held:*

1. A promise by a branch manager of a savings and loan association financing certain new construction made to a materialman supplying the general contractor of the construction project that future disbursements of construction funds to the general contractor would be by two-party checks naming the materialman as one payee in return for the extension of future credit by the materialman to the general contractor constitutes an ordinary contract between the materialman and the associa-

REFERENCES FOR POINTS IN HEADNOTES

[1] 17 Am Jur 2d, Contracts §§ 1 *et seq., 287.*

[2] 3 Am Jur 2d, Agency §§ 74, 75.

[3] 3 Am Jur 2d, Agency § 73 *et seq.*

[4] 75 Am Jur 2d, Trial § 406.

Question as one of law for court or fact for jury, whether oral promise was an original one or was a collateral promise to answer for the debt, default, or miscarriage of another. 20 ALR2d 246.

[5] 4 Am Jur 2d, Appeal and Error § 309 *et seq.*

[6] 3 Am Jur 2d, Agency §§ 1 *et seq., 199.*

27 Am Jur 2d, Equity § 20.

tion, not a contract of guaranty of payment by the general contractor. Characterization of the arrangement by the materialman as one "guaranteeing" payment to the materialman by the association does not automatically transform the agreement into a guaranty contract where, as here, the parties were using the word "guarantee" in its nonlegal common sense meaning.

2. Apparent authority for which a principal may be liable must be traceable to him and cannot be established by the acts and conduct of the agent. Apparent authority of an agent to act is to be determined from all the surrounding facts and circumstances and is prima facie coextensive with the business entrusted to his care. Under the facts of this case, Mr. Sauer had apparent authority to bind Saginaw to a promise to Great Lakes to issue construction draws to the contractor by two-party checks, naming Great Lakes as one of the payees in exchange for the extension of future credit to the contractor.

3. It is for the trier of fact to determine what the terms of an agreement really are where its terms are partly written, partly oral and disputed. Here the written construction loan agreement recited a "construction" fee paid by the Smiths to Saginaw. The oral explanation by Mr. Sauer to the Smiths regarding the obligations for which the fee was paid were proper parol supplementation of the written agreement. The terms of the agreement and whether or not the terms were breached were properly submitted for the jury's determination.

4. A fiduciary relationship exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of another. Relief will be granted when such position of influence has been acquired and abused or when confidence has been reposed and betrayed. The origin of the confidence and source of the influence are immaterial. Under the facts of this case the jury properly found the existence of a fiduciary relationship between the Smiths and Saginaw and a breach by Saginaw.

5. Failure by Great Lakes to serve Saginaw with a copy of its trial brief was harmless error in the absence of a showing of prejudice.

Affirmed.

1. CONTRACTS — ORDINARY CONTRACTS — GUARANTY CONTRACTS.

A promise by a branch manager of a savings and loan association financing certain new construction made to a materialman supplying the general contractor of the construction project that future disbursements of construction funds to the general contractor would be by two-party checks naming the material-

man as one payee in return for the extension of future credit by the materialman to the general contractor constitutes an ordinary contract between the materialman and the association, not a contract of guaranty of payment by the general contractor.

2. PRINCIPAL AND AGENT — APPARENT AUTHORITY — EVIDENCE — CONDUCT OF AGENT.

Apparent authority for which a principal may be liable must be traceable to him and cannot be established by the acts and conduct of the agent.

3. PRINCIPAL AND AGENT — APPARENT AUTHORITY — EVIDENCE.

Apparent authority of an agent to act is to be determined from all the surrounding facts and circumstances and is prima facie coextensive with the business entrusted to his care.

4. CONTRACTS — ORAL CONTRACTS — WRITTEN CONTRACTS — QUESTION OF FACT.

It is for the trier of fact to determine what the terms of an agreement really are where its terms are partly written, partly oral and disputed.

5. APPEAL AND ERROR — PRESERVING APPELLATE REVIEW.

An appellant who merely asserts a position without citing any applicable case law or policy considerations fails to preserve his position.

6. EQUITY — FIDUCIARIES — EXISTENCE OF RELATIONSHIP.

A fiduciary relationship exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of another; relief will be granted when such position of influence has been acquired and abused, when confidence has been reposed and betrayed; the origin of the confidence and source of the influence are immaterial.

*Karl A. H. Bohnhoff,* for plaintiffs.

*Walter Martin,* for defendant.

Before: CYNAR, P.J., and MacKENZIE and L. W. CORKIN,* JJ.

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

PER CURIAM. Defendant appeals as of right from a judgment entered upon two verdicts, one in the amount of $10,000 in favor of plaintiffs Smith and a second for $80,000 in favor of plaintiff Great Lakes Sales & Distributors (hereinafter Great Lakes), which judgment also awarded costs to plaintiffs, and from an order denying defendant's motion for a judgment *non obstante veredicto* or, in the alternative, for a new trial.

On June 15, 1974, plaintiffs Smith entered into a building agreement with Docter Building Co. for the construction of a summer and retirement home in Otsego County. The contract price for the house was $29,500. The Smiths then obtained a construction loan from defendant Saginaw Savings & Loan Association (hereinafter Saginaw) in the amount of $25,000 on August 2, 1974. Saginaw additionally charged a $250 "construction" fee. The Smiths were informed by Mr. Eugene Sauer, branch manager of Saginaw's Gaylord branch office, that the fee covered Saginaw's expenses in sending a man out to inspect the progress of the construction prior to the release of any progress payments to the builder.

The $25,000, as well as an additional $1,500 of the Smiths' own funds, were placed in a Due Borrower's Account, from which mortgage draws could be made in order to pay the builder periodically for work completed.

During this time period, the Smiths lived some 250 miles from the construction site and Mr. Smith was in poor health and had recently been hospitalized. Testimony established that the Smiths spoke only with Eugene Sauer when dealing with Saginaw, and that Sauer assured them that sufficient funds to complete the house would always be in the Due Borrower's Account. Sauer

told the Smiths that Saginaw would make certain that any work claimed by Docter Building Co. to have been completed was actually done prior to the release of any payments to Docter and that all required waivers of lien would be obtained. Sauer personally approved the builder and the building agreement signed by the Smiths.

The Smiths also stated that they had placed complete trust and confidence in Sauer and relied upon his judgment regarding the builder and the agreement with him as well as Sauer's representations regarding the quality and the progress of the construction.

Finally, it was brought out that Sauer knew of severe financial difficulties being encountered by Docter Building Co. during the period the Smith home was under construction which eventually culminated in the builder filing a voluntary petition in bankruptcy December 30, 1974. In spite of this knowledge, Sauer never informed the Smiths of it nor took any steps to protect the Smith retirement home, even though he had done so with his own home, which at the time was being constructed by the same builder.

Following the bankruptcy, the Smiths eventually were able to have construction completed on the project, at a cost far in excess of the original contract price.

Shortly after April 1, 1974, Docter Building Co. opened an account for building materials with plaintiff Great Lakes with a $10,000 credit limit. Charges accumulated on this account, first on construction projects not financed by Saginaw and then later on residential construction projects financed by Saginaw mortgages. Docter shortly thereafter fell in arrears in making payments on account, and Great Lakes cut off any future extensions of credit.

In late July of 1974, Gordon Peterson and Ronald Fiser, general partners of Great Lakes, went to Saginaw's Gaylord branch to meet with Eugene Sauer following a conversation they had with Russell Docter. During that discussion, Sauer stated that it was his understanding that Docter's bills were being paid. Sauer promised that the mortgage monies would be paid to Great Lakes through the use of two-party checks when all future draws were made, said checks to include Great Lakes as a payee. In consideration, Great Lakes was to release their credit cut-off as to Docter Building Co. so that those projects financed by Saginaw would continue toward completion.

Great Lakes allowed the builder to purchase additional materials on account and did receive some checks, said payments coming from the builder, not Saginaw, and not by two-party checks as promised by Sauer. In October of 1974, when additional billings had been made and no checks received therefor, Sauer was asked by Peterson and Fiser why no two-party checks had been issued or any mortgage draws had been made. Sauer indicated that no two-party checks were issued because he did not wish to arouse the suspicion of Saginaw's main office. Sauer then reaffirmed his pledge to issue two-party checks.

The next day Sauer, Peterson, Fiser, and Russell Docter met at Great Lakes' offices. It was agreed that Great Lakes would reapply payments previously made by the builder on jobs not financed by Saginaw to Saginaw-financed projects, some of which jobs were commenced later in time than the non-Saginaw construction.

By the end of October, the financial turmoil had not subsided, despite these promises, and Great Lakes threatened to file mechanics liens on all Saginaw-backed projects.

Sauer did not wish this to occur, since, if such liens were filed, no disbursements could be made to Great Lakes and the projects would be stalled. He asked Great Lakes to forbear filing any liens and represented that Docter at that time had $10,000 in an escrow account for the benefit of Great Lakes with an additional $8,000 to follow shortly. In return for its forbearance, Great Lakes was to receive the $18,000 mentioned above.

In November, one project was completed. Sauer had Peterson execute a waiver of lien in the amount of $6,581.67, then presented Peterson with a two-party check payable to the builder and Great Lakes but for only $3,182.91. Upon confronting a vice president from Saginaw's main office with the entire story, Peterson and Fiser were told that Sauer was solely responsible for the situation. Returning to Sauer, they were told that no further payments would be forthcoming and that they should seek legal redress. Shortly thereafter the builder filed the aforementioned bankruptcy petition, leaving a large balance on account unpaid.

Defendant raises numerous claims related to the trial court's denials of a number of its motions for directed verdict as well as other unrelated assignments of error.

Initially, Saginaw contends that the trial court erred in denying its motion for a directed verdict based upon its claim that the only agreement between it and Great Lakes was a contract of guaranty and that any claim thereunder had been discharged by the compromise settlement between Great Lakes and the trustee in bankruptcy for the estate of the builder. Plaintiff Great Lakes argues that the agreement between the two parties was an ordinary contract unaffected by the compromise in bankruptcy.

We are unpersuaded by Saginaw's argument. It is predicated upon a fallacious assumption that the colloquial language employed by Great Lakes' partners when testifying, *i.e.,* that Sauer *guaranteed* that Great Lakes would receive payment via two-party checks, evidenced not an ordinary contract between Great Lakes and Saginaw but a contract of *guaranty.*

It is clear that all parties concerned were employing the word guarant*ee* in a nonlegal common sense manner. Sauer's "guarantee" was nothing more than a promise to issue two-party checks which were to have the *effect* of "guaranteeing" payment to Great Lakes because of the requirement that Great Lakes countersign each such check prior to payment thereon. We find nothing which would indicate that Sauer, as an agent of Saginaw, was guaranteeing that Saginaw would pay Great Lakes in full upon the builder's failure to perform by tendering payment, the traditional paradigm of a contract of guaranty. *Moore v Capital National Bank of Lansing,* 274 Mich 56, 61; 264 NW 288 (1936), *Angelo Iafrate Co v M & K Development Co,* 80 Mich App 508, 514; 264 NW2d 45 (1978). Additionally, the promise by Sauer was bargained for and supported by consideration in the form of Great Lakes' reinstatement of credit to Docter Building Co.

Conversely, there was ample evidence indicating a promise on the part of Sauer, as branch manager of Saginaw, to pay Great Lakes irrespective of the builder's nonperformance in order to protect Saginaw's security interest in the mortgaged construction projects. This evidence was sufficient to allow submission of Great Lakes' claim to the jury on an ordinary contract theory and thus to defeat Saginaw's motion for directed verdict. *Kujawski v*

*Cohen,* 56 Mich App 533, 535-537; 224 NW2d 908 (1974). We decline to reverse on this issue.

We next address the major issue involved in this case, *viz.,* whether the trial court erred in denying Saginaw's motions for a directed verdict against both plaintiffs based on Saginaw's claim that there was insufficient evidence that Saginaw's branch manager, Eugene Sauer, had authority either (1) to bind defendant to a promise to issue two-party checks to Great Lakes or (2) to bind defendant to a promise to supervise and ensure construction of the retirement home of plaintiffs Smith.

The resolution of this issue turns on whether Sauer had either *actual* or *apparent* authority to do either act.

With respect to Sauer's authority to *issue* two-party checks, the evidence presented established that he had actual authority to do so and did in fact issue two-party checks to Docter Building Co. and various other materialmen and subcontractors during the period in question. The question then is reduced to whether Sauer could bind Saginaw with his promise to issue two-party checks to Great Lakes. We find that he could and did.

It is well established that the apparent authority for which the principal (here Saginaw) may be liable must be traceable to it and cannot be established by the acts and conduct of the agent. *La-Pointe v Chevrette,* 264 Mich 482, 493; 250 NW 272 (1933). Apparent authority to act is to be determined from all the surrounding facts and circumstances, *Atlantic Die Casting Co v Whiting Tubular Products, Inc,* 337 Mich 414, 422; 60 NW2d 174 (1953). Continuing, the Court in *Atlantic Die Casting Co, supra,* 422 stated:

"Whenever a principal has placed an agent in such a

situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in assuming that such agent is authorized to perform in behalf of the principal the particular act, and such particular act has been performed, the principal is estopped from denying the agent's authority to perform it. * * *

" 'The general rule is that the powers of an agent are prima facie coextensive with the business intrusted to his care.' *Grossman v Langer,* 269 Mich 506, 510 [257 NW 875 (1934)]."

The facts and circumstances in this case compel the conclusion that Sauer had apparent authority to bind Saginaw to his promise to issue two-party checks.

Mr. Sauer was manager of Saginaw's Gaylord branch, occupying the only separate office in the Gaylord building. He was in complete charge of the operation of the Gaylord branch. His desk had a sign on it indicating that he was an assistant vice president. Customer draws on mortgage funds were directed to him, and he distributed the checks therefrom to the contractors. He was equipped with the trappings of a managing executive by Saginaw. A prudent observer would see that contractors went to Sauer with requests for draws. Inspections were done at Sauer's direction. He also dealt directly with loan customers and was the only representative of Saginaw who would make contact with nine of ten loan customers.

Thus, a reasonable belief would be created in the minds of Great Lakes' partners that Sauer had been vested with authority by Saginaw not only to issue two-party checks but to make a binding promise to do so.

We also find that Sauer had apparent authority to bind Saginaw to a promise to insure the satisfactory completion of the Smith retirement home.

Many of the above-noted facts are equally apposite when reviewing this question. In addition, Sauer was charged with the duty of dealing with construction mortgage loan customers, as well as explaining to them the terms of loan agreements, including the $250 "construction" fee. He also explained the obligations undertaken by Saginaw in return for such fee, which to the reasonable individual, under the *Atlantic Die Casting Co* test, would appear to be *promises* exacted as a quid pro quo for the fee. Further, in this case Saginaw did nothing affirmative to dispel these appearances but instead passively acquiesced by its silence.

Saginaw next claims that the trial judge erred in submitting the claim of plaintiffs Smith to the jury on a breach of contract theory as there was insufficient evidence thereon. Defendant argues that its motion for directed verdict on this question should have been granted. We disagree with Saginaw.

Although the written agreement between the Smiths and Saginaw did not expressly comprehend Saginaw's liability for failure to supervise construction, the oral "explanations" of Eugene Sauer regarding the obligations for which the $250 construction fee was paid, which were not in the written agreement, were proper parol supplementation of the written memorandum. Also, the admission of this evidence was not met with any objection at trial. Where, as here, the terms of an agreement are partly written and partly parol and are disputed, it is for the trier of fact to determine precisely what the terms of the agreements really are. *Barton v Gray*, 57 Mich 622; 24 NW 638 (1885). We find no error in the jury's findings as to the terms of the agreement.

We further find that there was sufficient evi-

dence of a breach of the above agreement for submission of that question to the jury. It was established that Saginaw, through Sauer, allowed construction to fall behind progress payments, allowed Docter Building Co. to breach its obligation to plaintiffs Smith, and failed to ensure that construction was completed within the limits of the committed funds. Therefore, no error resulted from allowing the jury to decide whether these facts constituted a breach of the construction loan agreement. *Kujawski v Cohen, supra,* 535-537.

Saginaw further alleges that it was error for the trial court to deny its motion for a directed verdict as against plaintiffs Smith's claim of breach of fiduciary duty by Saginaw through Eugene Sauer.

By failing to cite applicable case law or any policy considerations and by merely asserting a position, Saginaw has abandoned this argument. *Mitcham v Detroit,* 355 Mich 182, 203; 94 NW2d 388 (1959). Were we to address the merits of this question, there is little doubt that a fiduciary relationship between the Smiths and Saginaw, through its agent, Sauer, was established and a breach thereof occurred. This relationship was not the general one existing between a bank and its depositors but was one of trust and confidence predicated on the unique facts of this case.

A fiduciary relationship exists when there is a reposing of faith, confidence and trust and the placing of reliance by one upon the judgment and advice of another. *Williams v Griffin,* 35 Mich App 179, 183; 192 NW2d 283 (1971). Relief is granted when such position of influence has been acquired and abused, when confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. *Stephenson v Golden,* 279 Mich 710, 739; 276 NW 849 (1937).

Plaintiffs Smith placed their trust in Eugene Sauer. Joseph Smith, at the time, was in and out of the hospital and quite sick. He and his wife were 250 miles away when construction was in progress and, necessarily, were unable to oversee day-to-day activities. Sauer additionally gave repeated assurances to the Smiths that funds were on hand to complete construction and the project would be finished without cost overruns. Aside from their striking an agreement with Russell Docter, Sauer was their sole contact in the area and the only emissary of Saginaw with whom they dealt. Sauer further assured them that no funds would be released without the work therefor actually being done. Sauer approved of the builder, the building agreement and the building specifications. Sauer knew of Docter Building's financial straits and protected his own interests without in any way doing the same for the Smiths. He also permitted Docter Building Co. to fall behind in construction and allowed the release of funds for work not fully completed. These facts plainly established the existence of a fiduciary obligation and the breach thereof.

Defendant further assigns as reversible error the failure of plaintiffs to serve upon it a copy of their trial brief pursuant to a pretrial order of the trial court. The defendant submitted no trial brief. The record does not support defendant's position that it was unaware of plaintiff Great Lakes' theory of recovery under ordinary contract principles before trial and was prejudiced at trial by the failure to receive a copy of Great Lakes' trial brief from which it could formulate a defense. Great Lakes' complaint, contrary to Saginaw's claim, did not allege a contract of guaranty but only recited facts consistent with a theory of recovery under general

contract principles. Defendant fixed upon the notion of a guaranty, not plaintiffs. Saginaw having failed to establish that it was prejudiced by the failure of Great Lakes to serve it with a copy of their trial brief, the error caused by such omission, if any, was harmless. *Cf., In re Grand Haven Highway,* 357 Mich 20, 25-26; 97 NW2d 748 (1959), *Union Trust Co v Detroit Trust Co,* 240 Mich 646, 651-652; 216 NW 442 (1927).

Defendant Saginaw's final predication of error, that the verdicts rendered in the court below were against the great weight of the evidence, is devoid of merit. Under the applicable standard, there was more than sufficient evidence to substantiate the jury findings. *Doyle Vacuum Cleaner Co v F J Siller & Co,* 55 Mich App 601, 611; 223 NW2d 86 (1974). *Reed v Stretten,* 69 Mich App 519, 520-521; 245 NW2d 117 (1976).

Finding no error necessitating reversal, we hereby affirm.

Affirmed. Costs to plaintiffs.