MICHIGAN NATIONAL BANK OF DETROIT v KELLAM

Docket No. 50748. Submitted February 11, 1981, at Detroit.—Decided July 8, 1981. Leave to appeal applied for.

Doctors David A. Kellam, Paul A. Trimmer and Walter K. Bradley obtained a construction mortgage commitment from the Alexander Hamilton Life Insurance Company in the amount of $1,400,000 for the purpose of constructing a hospital facility on land owned by Dr. Bradley and his wife. The insurance company required a commitment fee of $140,000, which the three doctors obtained through a loan from Michigan National Bank of Detroit. As security for the loan, Michigan National received a promissory note signed by the three doctors and a first mortgage on the hospital site. The parties subsequently refinanced the loan, and a new promissory note in the amount of $143,043.10 was given to Michigan National. Dr. Bradley then sought additional investors and retained attorney Kenneth Afton to assist him. New investors were obtained and Drs. Kellam and Trimmer ended their association with the project. The new investors became known as the "Huron Valley Medical Associates". Attorney Afton drafted a certificate of copartnership and a general partnership agreement, which were signed by the various associates individually as well as by Bradley and Dr. David Gordon. By the terms of the partnership agreement, Bradley conveyed the proposed hospital site to the partnership and warranted that the property was free and clear of all liens and encumbrances except those listed on "Exhibit B". "Exhibit B" was nonexistent at the time the

REFERENCES FOR POINTS IN HEADNOTES

[1] 3 Am Jur 2d, Agency § 360.
[2] 4 Am Jur 2d, Appeal and Error § 76.
   5 Am Jur 2d, Appeal and Error § 839.
[3] 3 Am Jur 2d, Agency §§ 73, 261.
[4, 5] 3 Am Jur 2d, Agency § 352.
[6] 3 Am Jur 2d, Agency § 76.
[7] 74 Am Jur 2d, Suretyship § 8.
[8] 74 Am Jur 2d, Suretyship §§ 135, 168.
[9] 74 Am Jur 2d, Suretyship § 146.
[10] 74 Am Jur 2d, Suretyship § 171.

associates signed the partnership agreement. Included in "Exhibit B" when drafted was a reference to the $143,043 promissory note signed by Drs. Kellam, Trimmer and Bradley. "Exhibit B" was entitled "Obligations Assumed by the Partnership". The associates all denied personal knowledge of "Exhibit B" prior to this litigation and denied that Afton was authorized to draft the partnership agreement. Drs. Kellam and Trimmer became concerned about their liability under the promissory note and retained attorney Irvin J. Deutch to investigate the matter. Based upon a letter from Afton, in which Afton forwarded a copy of the partnership agreement to Deutch, Deutch advised Kellam and Trimmer that their obligations had been assumed by the partnership and that they should not take any action to hinder the development of the project. The note was not paid and Michigan National filed suit in Oakland Circuit Court against Kellam, Trimmer and Bradley. Kellam and Trimmer filed a third-party complaint against Bradley and the Huron Valley Medical Associates, jointly and severally, alleging that the partnership had assumed liability for the debt. The associates denied liability for the debt. Kellam and Trimmer notified the partnership and Bradley of their intent to settle the claim against them with Michigan National and asked the partnership and Bradley to pay the settlement costs or post a bond and continue their defense. The request was refused, the partnership and Bradley stating that any settlement would be deemed voluntary on the part of Kellam and Trimmer. Settlement was reached between Michigan National and Kellam and Trimmer, with neither party admitting liability. Following trial on the third-party complaint, the court ruled that Kellam and Trimmer were entitled to judgment of $56,005.94 because the associates had clothed attorney Afton with apparent authority to act as their agent and to bind them on the disputed liabilities, that Kellam and Trimmer had reasonably relied, to their detriment, on such apparent authority and that the partners were estopped from denying liability for the negotiated settlement, James S. Thorburn, J. The partnership and its individual members appeal. *Held:*

1. The trial court erred by finding that the partnership and its individual members had clothed Afton with apparent authority to act as their agent. Kellam and Trimmer relied on advice of their counsel, which was based upon representations made to him by Afton, not by the partnership or its individual members. Apparent authority may not be established by the representations of the agent.

2. The error does not require reversal, however, because

there is an independent basis of estoppel for imposing liability on the partnership and its members. The partnership and its members are estopped from denying liability on the debt listed in "Exhibit B" because they negligently induced Kellam and Trimmer to believe that their debt to Michigan National was assumed by the partnership. Kellam and Trimmer justifiably relied on the representation and they would incur considerable prejudice if the partnership and its members were permitted to deny the existence of the obligation.

3. The settlement between Michigan National and Kellam and Trimmer did not render void Kellam and Trimmer's right to indemnity.

Affirmed.

1. AGENCY — EXISTENCE OF AGENCY RELATIONS.

Disputes over the existence and scope of an agency relationship are properly determined as a question of fact.

2. APPEAL — FINDINGS OF FACT — COURT RULES.

The authority of the Court of Appeals to contradict a trial court's findings of fact is limited to determining whether the findings are clearly erroneous in light of the evidence supporting them (GCR 1963, 517.1).

3. AGENCY — APPARENT AUTHORITY.

A principal is liable for the acts of an agent whom the principal, by statements or conduct, places in a position where he appears with reasonable certainty to be acting for the principal, or without interference suffers the agent to assume such a position and thereby justifies those dealing with the agent in believing that he is acting within the mandate, thereby creating an apparent authority which replaces that actually conferred, the measure of such apparent authority consisting of those powers which the principal has thus caused or permitted the agent to seem to possess to persons of reasonable prudence, ordinarily familiar with business practices and dealing with the agent and irrespective of the absence of intention to confer such power upon the agent.

4. AGENCY — APPARENT AUTHORITY.

Apparent authority of an agent to act is to be determined from all the surrounding facts and circumstances.

5. AGENCY — APPARENT AUTHORITY — EVIDENCE — CONDUCT OF AGENT.

Apparent authority for which a principal may be liable must be

traceable to him and cannot be established by the acts and conduct of the agent.

6. ESTOPPEL — INDUCEMENT — RELIANCE.
   Estoppel arises where: (1) a party, by representation, admissions or silence, intentionally or negligently induces another party to believe facts; (2) the other party justifiably relies and acts on this belief; and (3) the other party will be prejudiced if the first party is permitted to deny the existence of the facts.

7. SURETYSHIP AND GUARANTEE — CREATION OF SURETYSHIP.
   The relation of suretyship, although it generally is created by express contract of the parties and with the consent of the creditor, may nevertheless arise by operation of law.

8. SURETYSHIP AND GUARANTEE — PAYMENT BY SURETY — INDEMNITY.
   A creditor may seek recovery of a material obligation directly from a surety without adversely affecting the surety's right to indemnity from the principal debtor.

9. SURETYSHIP AND GUARANTEE — ACTIONS — INTERVENTION.
   A principal debtor has a general right to intervene in an action properly brought directly against his surety for payment of the underlying obligation.

10. SURETYSHIP AND GUARANTEE — REIMBURSEMENT.
    A surety is entitled to reimbursement when required to pay his principal's obligation.

*Abbott, Nicholson, Quilter & Esshaki, P.C.,* for defendants Kellam and Trimmer.

*Mulvoy & Mulvoy,* for defendants Huron Valley Medical Associates.

Before: M. J. KELLY, P.J., and V. J. BRENNAN and T. M. BURNS, JJ.

M. J. KELLY, P.J. Third-party defendants-appellants, Huron Valley Medical Associates, a partnership formed to develop a hospital in the Milford, Michigan area, and its individual partners, appeal as of right an order of the lower court directing these various defendants to pay to third-party

plaintiffs-appellees, Kellam and Trimmer, $46,671.62, plus costs of $404.94. The amount represented the third-party defendants' share of a negotiated settlement of plaintiff bank's earlier suit for payment on a promissory note of third-party plaintiffs, which the trial court found had been assumed by the defendants. The pertinent facts leading up to this order are as follows.

## FACTS

In November of 1971, Dr. Walter K. Bradley (not a party to this appeal) approached Drs. Kellam and Trimmer regarding the construction of a hospital facility in Milford. The three obtained a construction mortgage commitment from the Alexander Hamilton Life Insurance Company in the amount of $1,400,000, for which they were required to pay a commitment fee of $140,000. This "front" money was obtained through a loan from the Michigan National Bank of Detroit (hereinafter referred to as "Michigan National"). As security for the loan, Michigan National received a promissory note signed by Bradley, Kellam and Trimmer and a first mortgage on the hospital site. In September of 1972, Michigan National agreed to refinance the loan and accepted a new note for $143,043.10. The land proposed for the hospital site was owned entirely by Bradley and his wife.

In early 1973, Bradley attempted to increase his financing capabilities by enlarging the circle of investors. He retained attorney Kenneth Afton to assist him in this regard and additional investors later entered into the venture. It is undisputed that after August of 1973, Kellam and Trimmer were no longer associated with the project. The new group of investors took the name of "Huron Valley Medical Associates" and Afton drafted a

certificate of copartnership and a general partnership agreement dated January 1, 1974. These documents were signed by the various partners individually, as well as by Bradley and Dr. David Gordon (not a party to this appeal).

Pursuant to paragraph 3(A) of the partnership agreement, Bradley conveyed the proposed hospital site to the partnership. Paragraph 3(B) of the partnership agreement stated in part:

"Bradley warrants that the property is free and clear of all liens and encumbrances except those listed on Exhibit B."

At the time the partners signed the agreement, "Exhibit B" was not attached and, in fact, had not been drafted. Afton prepared Exhibit B after Bradley returned the signed partnership agreement to him. The document, entitled "Obligations Assumed by the Partnership", contains a list of liabilities incurred in conection with the hospital project. Included on the list was a reference to "front money" in the amount of $143,041, which was the amount of the promissory note executed by Bradley, Kellam and Trimmer. It was stipulated at trial that, if the individual partners testified, they would deny any personal knowledge of Exhibit B prior to the litigation and that Afton was never authorized to draft the partnership agreement.

In May of 1974, Kellam and Trimmer, concerned about their liability to Michigan National under the 1972 promissory note, retained the services of attorney Irwin J. Deutch to investigate the matter. They urged Deutch to contact Afton since they believed he was the attorney representing the partnership. Afton informed Deutch that he possessed a copy of the partnership agreement with a list of the partnership obligations and forwarded

to Deutch a copy of the partnership agreement, with Exhibit B attached. A letter accompanying the documents stated, "Appended to the [partnership agreement] is a schedule B, which lists the obligations the partners are assuming". Based on this information, Deutch advised Kellam and Trimmer that their individual obligations had been assumed by the partnership and that they should not take any action to hinder the development of the project.

Michigan National was not paid and, on May 11, 1977, it filed suit against Kellam, Trimmer and Bradley, alleging a deficiency of $94,820.61. Kellam and Trimmer thereafter filed an answer denying the claim and, on the same date, filed the instant third-party complaint.

The third-party complaint alleged that the partnership, pursuant to Exhibit B of the partnership agreement, assumed liability on the promissory note effective January 1, 1974, and had also agreed to reimburse Kellam and Trimmer in the amount of $6,000 each for interest payments previously made to Michigan National. Accordingly, Kellam and Trimmer sought to hold the partnership and partners jointly and severally responsible for "whatever sum they were adjudged liable to the bank" and for all interest payments previously tendered. The partners denied any such liability.

Kellam and Trimmer subsequently entered into negotiations with Michigan National to settle the principal claim. The third-party defendants were notified and asked to pay the settlement costs or post a bond and continue their defense. They refused and stated that any settlement would be deemed voluntary on the part of Kellam and Trimmer. Thereafter, Michigan National and the third-party plaintiffs settled the initial claim for

$50,000. The terms of the settlement expressly provided that neither of the parties admitted liability.

## Trial

A nonjury trial was held on September 12 and 15, 1978, and September 6 and 7, 1979. Thereafter, the court granted the third-party defendants' motion to reopen the proofs and conducted a further evidentiary hearing on November 19, 1979.

In his opening statement, counsel for third-party plaintiffs asserted two alternate theories of liability: (1) that Exhibit B of the partnership agreement resulted in assumption of liability as a matter of law, or (2) that the agreement was intended to benefit Kellam and Trimmer and third-party beneficiaries, who relied on the agreement to their detriment. Following the opening statement, the third-party defendants moved for a dismissal because the third-party complaint had prayed for reimbursement of any sums Kellam and Trimmer were found obligated to pay to Michigan National and the settlement precluded any finding of liability. In response, third-party plaintiffs argued that when the partnership assumed the debt the partners became principally liable and Kellam and Trimmer became sureties as a matter of law. It was argued that, as sureties, Kellam and Trimmer had an absolute right to compromise the claim and still seek reimbursement. After additional arguments on September 15, 1978, the court held that the motion should be granted because the partnership agreement, at the time it was signed, did not contain an agreement to assume the contested liabilities. The court held that under the parol evidence rule it was bound by the partnership agreement and that Kellam and Trimmer had

failed to plead any theory which would create an exception to that rule. The court, however, also "reserved the right to change [its] mind" and stated that it would permit a separate record to be made before an order dismissing the case was signed.

The proceedings were resumed September 6, 1979, at which time the third-party plaintiffs presented as witnesses attorneys Afton and Deutch and Dr. David Kellam. The partners' attorney then renewed his prior motion to dismiss, contending that the action was barred by the settlement. The lower court found that Kellam and Trimmer had to make payment to Michigan National on an obligation which had been assumed by the partnership and permitted them to amend their complaint to allow recovery for any sums paid in connection with liabilities assumed by the Huron Valley Medical Associates. Thereupon, the court denied the motion to dismiss.

After further arguments, an opinion was rendered holding that Exhibit B was intended to be part of the "contract" and that Kellam and Trimmer could not have known that the exhibit was not agreed to by the partners. The court also found that the third-party plaintiffs had reasonably relied on the representations of Kenneth Afton because he had been placed in a position of apparent authority by the partnership. Based upon those findings, the court ruled that third-party plaintiffs were entitled to a judgment in the amount of $56,005.94. In response, the third-party defendants filed a subsequent motion requesting the trial court to (1) amend its findings of fact, (2) order a new trial, (3) permit them to implead attorney Afton as a fourth-party defendant, or (4) reopen the proofs for further testimony. The third-

party defendants also filed an amended answer raising the affirmative defenses of voluntary payment and the statute of frauds.

In a subsequent hearing, Dr. Gordon, one of the partners, testified that he was unaware of the partnership's new liabilities at the time he signed the partnership agreement. Gordon also said that he thought Afton would draft and attach Exhibit B, but he did not authorize Afton to incur any liabilities on his behalf. He also testified that Afton was Bradley's attorney and had not been retained separately by the partnership.

In its final opinion, the lower court concluded that the partners had clothed attorney Afton with apparent authority to act as their agent and to bind them on the disputed liabilities. The court further opined that Kellam and Trimmer had reasonably relied, to their detriment, on such apparent authority and that the partners were estopped from denying liability for the negotiated settlement.

## THE APPEAL

The primary issue in this appeal concerns the trial court's factual finding that attorney Afton was the partnership's agent, with authority to bind the organization and partners to the disputed liability. The law of Michigan is that disputes over the existence and scope of an agency relationship are properly determined as a question of fact. *Birou v Thompson-Brown Co*, 67 Mich App 502, 506; 241 NW2d 265 (1976), citing *Head v Benjamin Rich Realty Co*, 55 Mich App 348, 357; 222 NW2d 237 (1974), and *Ardash v Karp*, 18 Mich App 241, 244; 170 NW2d 854 (1969). See also *Lincoln v Fairfield-Nobel Co*, 76 Mich App 514; 257 NW2d 148 (1977). Further, our authority to contradict

such findings of fact is limited to determining whether the findings are clearly erroneous in light of the evidence supporting them, *Knight v Michigan,* 99 Mich App 226, 232-233; 297 NW2d 889 (1980), GCR 1963, 517.1.

At the conclusion of the proceedings below, the trial court first held that Afton was an agent of the partnership by virtue of the apparent authority conferred upon him by the actions of the partners and, second, that these actions were sufficient to establish Afton's apparent authority to bind the organization to pay the third-party plaintiffs' debt to Michigan National. In *Central Wholesale Co v Sefa,* 351 Mich 17, 25; 87 NW2d 94 (1957), the Supreme Court quoted 2 CJS, Agency, § 96, pp 1210-1211, for the following description of the prerequisites necessary to a finding of agency by apparent authority:

"Whenever the principal, by statements or conduct, places the agent in a position where he appears with reasonable certainty to be acting for the principal, or without interference suffers the agent to assume such a position, and thereby justifies those dealing with the agent in believing that he is acting within his mandate, an apparent authority results which replaces that actually conferred as the basis for determining rights and liabilities. The measure of authority consists of those powers which the principal has thus caused or permitted the agent to seem to possess, whether the agent had actual authority being immaterial if his conduct was within the apparent scope of his powers; the question involved is no longer what authority was actually given or was intended by the parties to the agency agreement, but resolves itself instead into the determination of what powers persons of reasonable prudence, ordinarily familiar with business practices, dealing with the agent might rightfully believe him to have on the basis of the principal's conduct. Absence of intention to confer any power of the character of that exercised cannot

be asserted so as to avoid or vitiate the authority, for the agent's authority as to those with whom he deals is what it reasonably appears to be."

See also *Moreschini v Regional Broadcasters of Michigan, Inc,* 373 Mich 496, 498; 129 NW2d 859 (1964), and *Smith v Saginaw Savings & Loan Ass'n,* 94 Mich App 263, 271; 288 NW2d 613 (1979) ("Apparent authority to act is to be determined from all the surrounding facts and circumstances.").

### FINDINGS

Our review of the facts and circumstances surrounding this case discloses that sufficient evidence was presented to support a finding of apparent authority. However, the facts as determined below do not compel the further conclusion that the partners held Afton out as possessing authority to bind them to Exhibit B of the partnership agreement. No member of the partnership was contacted regarding the assumption of this liability and there was no direct representation that Afton could speak for them in that regard. While third-party plaintiffs contacted Afton because they thought he was the partnership attorney, there was no evidence that this belief was derived from the actions of the partners. The partners' sole "representation" was to allow Afton to retain the signed partnership agreement after it was executed without Exhibit B attached. Without more, this manifestation of intent is insufficient to find that the partners "clothed" Afton with authority to bind the partners to Exhibit B. The representations regarding Afton's authority were mainly generated by Afton himself. Thus, Afton spoke with the third-party plaintiffs' attorney and told

him that the partnership had assumed the obligations of Kellam and Trimmer and sent him a copy of the signed agreement with exhibit B attached. Apparent authority, however, may not be established by the representations of the agent. *Smith v Saginaw Savings & Loan Ass'n, supra,* 271, 3 Am Jur 2d, Agency, § 74, p 476. Accordingly, the trial court's finding of apparent authority was erroneous.

We do not view the above error as requiring reversal of the judgment entered below, however, since there is an independent basis for imposing liability on the third-party defendants. In *Wynn v Farmers Ins Group,* 98 Mich App 93, 98; 296 NW2d 197 (1980), this Court summarized the elements necessary to a finding of estoppel:

"Estoppel arises where: (1) a party, by representation, admissions or silence, intentionally or negligently induces another party to believe facts; (2) the other party justifiably relies and acts on this belief; and (3) the other party will be prejudiced if the first party is permitted to deny the existence of the facts."

See also *Dimmitt & Owens Financial, Inc v Realtek Industries, Inc,* 90 Mich App 429, 433; 280 NW2d 827 (1979), *Johnson v Harper-Grace Hospital,* 92 Mich App 202, 205; 284 NW2d 520 (1979), and *Conel Development, Inc v River Rouge Savings Bank,* 84 Mich App 415, 422-423; 269 NW2d 621 (1978), cited by the *Wynn* Court.

In our view, the evidence offered at trial discloses sufficient facts which, when applied to the legal standards, prevent the third-party defendants from denying liability for the contested debt. The partners began this unusual series of transactions by entering into an incomplete partnership agreement. The capital contribution of each partner was

$15,000 in cash, except for Dr. Bradley, who donated "the real estate described in Schedule [Exhibit] A" worth $45,000. The very next subsection of the agreement noted that the Bradley property was free of all encumbrances "except those listed on Exhibit B", an exhibit not attached to the principal document and, according to the evidence, not even in existence at that time. We note further that the partnership agreement and later-attached Exhibit B were prepared on stationery bearing the name of attorney Afton, thus indicating that Afton was acting at least in part on behalf of the partnership. Finally, the agreement, including its reference to "Exhibit B", was entrusted to attorney Afton.

CONCLUSION

Viewing these facts as a whole, we conclude that the partners' actions (representations) negligently induced third-party plaintiffs Kellam and Trimmer to believe their debt to Michigan National was assumed by the partnership. The evidence also discloses a justifiable reliance on the partners' representation, which conclusion is supported by the third-party plaintiffs' almost-three-year period of inaction following Afton and Deutch's assurances of the debt's assumption. Lastly, the third-party plaintiffs would incur considerable prejudice if the partners were permitted to deny the existence of the obligations. The partners are thus estopped from denying liability on the debt listed in Exhibit B.

We also address a second issue raised by the third-party defendants. It is argued that the third-party plaintiffs' settlement with Michigan National, executed while they stood in an alleged surety relationship with the bank and partners,

released the partners' obligation to pay the assumed debt. In this regard, third-party defendants claim that the obligation to Michigan National was not proved and that, in fact, the settlement agreement specifically disclaimed liability for the debt. Thus, because the third-party plaintiffs made payment on a then-nonexistent obligation of the partners, it is asserted that the obligation may not be enforced.

Prior decisions of Michigan's Supreme Court indicate that, contrary to the general rule that a surety relationship may arise only as a result of an express contract, see 74 Am Jur 2d, Suretyship, § 7, p 16, a suretyship relation in Michigan may come about without express agreement as a matter of law under facts similar to those herein. *Smith v Shelden,* 35 Mich 42, 48; 24 Am Rep 529 (1876), *Keyworth v Wiechers,* 269 Mich 687, 696; 257 NW 755 (1934), *rev'd on other grounds* 273 Mich 347; 263 NW 57 (1935). However, it has also been held that a creditor may seek recovery of a material obligation directly from a surety without adversely affecting the surety's right to indemnity from the principal debtor. See *Stratford Arms Hotel Co v General Casualty & Surety Co,* 249 Mich 518, 523-524; 229 NW 506 (1930), noting the general right of the principal debtor to intervene in an action properly brought directly against its surety.[1]

---

[1] In this situation, the surety is not left without a remedy. The Supreme Court, in *Ellis v Phillips,* 363 Mich 587, 598; 110 NW2d 772 (1961), quoted with approval the following passage from 50 Am Jur, Suretyship, § 225, pp 1051-1052:

"No principal in equity is more familiar, or more firmly established, than that a surety, after the debt for which he is liable has become due, without paying or being called on to pay it, may file a bill in equity in the nature of a bill *quia timet* to compel the principal debtor to exonerate him from liability by its payment, provided no rights of the creditor are prejudiced thereby."

A surety is not, however, required to pursue this remedy.

In light of a creditor's right to seek payment first from the surety, it would be anomalous for this Court to uphold the position of third-party defendants, which would apparently prohibit a surety from settling the suit against it for fear that the right to be indemnified would thereby be lost. In this case, third-party plaintiffs were called upon to make good on a debt for which they stood as surety to the principal debtors. Prior to settling the action, third-party plaintiffs requested the partners to intervene and defend the suit, which request was refused. We are unaware of any authority which would require a judgment against the third-party defendants as a prerequisite to a surety's right to be indemnified after payment of the principal debt. Under these facts, it is apparent that the third-party plaintiffs, as sureties, were "held to pay" the debt assumed by the partners and thus acquired a valid right to be reimbursed. See *Canadian Bank of Commerce v Coumbe,* 47 Mich 358, 362; 11 NW 196 (1882), and *Ellis v Phillips,* 363 Mich 587, 596; 110 NW2d 772 (1961) ("It is fundamental that a surety, when required to pay its principal's obligation, is entitled to reimbursement.") Therefore, the settlement between Michigan National and third-party plaintiffs did not render void their right to indemnity.

Our disposition of the above issues renders further review of the appellant's allegations of error unnecessary.

Affirmed.