**In the Matter of SPECIAL ABRASIVES, INC., a Michigan corporation, Debtor.**

**Bankruptcy No. 80–05656–G.**

United States Bankruptcy Court,
E.D. Michigan, S.D.

Jan. 10, 1983.

Clarence L. Pozza, Jr., Detroit, Mich., for Equico.

John Young, Detroit, Mich., for the Bank.

## OPINION

RAY REYNOLDS GRAVES, Bankruptcy Judge.

This proceeding seeks a determination of the rights of the parties as to funds in a certain escrow account; the escrowed money represents the proceeds of an account receivable which the account debtor, General Electric, paid to the escrow agent, Merrill, Lynch, Pierce, Fenner & Smith, pursuant to order of this Court. The facts are as follows.

On July 1, 1975, Michigan National Bank of Macomb (hereinafter referred to as the "Bank") loaned $135,000 plus interest of $35,000 to Special Abrasives, Inc. (hereinafter referred to as "Special Abrasives"). On that same day, Thaddeus Bednarski, the President of Special Abrasives, gave the Bank a valid and duly executed promissory note for the loan, as well as a security interest in all of Special Abrasives' presently owned and after-acquired property. The security agreement[1] specifically listed the collateral as: a) accounts receivable; b) inventory now owned or hereafter acquired; c) all equipment and fixtures; d) a 1971 32 foot Luhrs Cruiser owned jointly by Thaddeus Bednarski and John Bednarski; and e) proceeds.

On July 7, 1975, the Bank filed its UCC–1 financing statement.[2] Special Abrasives

---

1. Paragraph 6B of the parties' security agreement provides: "Until such time as the Bank shall notify Borrower of the revocation of such power and authority, Borrower (i) may, only, in the ordinary course of its business, at its own expense, sell, lease or furnish under contracts of service any of the inventory normally held by borrower for such purpose.... A sale in the ordinary course of business does not include a transfer in partial or total satisfaction of a debt."

2. The financing statement adequately describes the collateral. The validity of the loan, promissory note, security agreement or financing statement is not in issue.

used the money that it borrowed from the Bank to manufacture vibratory finishing machines.[3] A substantial portion of Special Abrasives' business consists of manufacturing and selling such machinery, as well as doing finishing work itself.

On September 15, 1977, Equico Lessors, Inc., (hereinafter referred to as "Equico") purchased four model SPA 816 vibratory finishing machines from Special Abrasives. Equico subsequently leased the four SPA 816's to Wolverine Plating Corporation.

On September 21, 1978, Equico purchased two SPA 816 machines from Special Abrasives. Equico leased the machines back to Special Abrasives, who ultimately leased them to Dyna-Tek Finishing Corporation.[4]

On May 21, 1978, Mr. Robert C. Wheaton, a Branch Credit Manager of Equico, sent the Bank a letter requesting that the Bank subordinate its security interest in one of the vibratory finishing machines to that of Equico. Equico proposed to extend credit to Special Abrasives in return for a security interest in one SPA 816 vibratory finishing machine, but was unwilling to do so without the Bank's promise to subordinate its security in the same machine. On September 27, 1978, Mr. Richard E. Ross, Senior Vice President of the Bank, sent to Mr. Greg Vye of Equico a letter of subordination. The letter explicitly stated that the Bank was subordinating its security interest in one SPA 816 vibratory finishing machine to the security interest of Equico in that same machine.

During 1979, Wolverine, Dyna-Tek and Special Abrasives defaulted in the terms of their leases of the SPA 816 machines with Equico. In July, 1979, Equico repossessed several of the machines it had leased, including the two SPA 816 machines at issue.[5] Equico stored the machines with Machinery Mart of Detroit, Michigan. Equico then commenced litigation in the state court to recover the amounts due it under the terms of the lease agreements with Wolverine, Dyna-Tek and Special Abrasives.

On January 11, 1980, Equico, Dyna-Tek and Special Abrasives executed a settlement agreement whereby Special Abrasives agreed to pay to Equico $275,000 less certain amounts previously paid to Equico by Specialty Finishing Corporation and Rene Baxtor, the guarantors. A second settlement agreement was simultaneously executed between Equico and Specialty Finishing, whereby Equico agreed to transfer the two SPA 816 machines then being stored at Machinery Mart to Specialty Finishing. Specialty Finishing subsequently refurbished the machines and sold them to General Electric Corporation, generating the receivable at issue.

On October 3, 1980, Special Abrasives filed its Chapter 11 petition with this Court. On September 1, 1982, the case was converted to a Chapter 7 proceeding.

The parties thereafter sought a determination of rights as to the $68,000 receivable. On October 8, 1982, this Court entered an order directing the turnover of the money to be held in escrow in the Merrill Lynch Ready Asset Trust account, until such time as the right to proceeds is determined. The

---

**3.** A vibratory finishing machine is a machine used to remove burrs from steel bolts and nuts.

**4.** The Bank argued that because Special Abrasives and Equico entered into a sale-leaseback agreement for these machines the transaction cannot constitute a "sale" within the meaning of that term as it is used in the Michigan Uniform Commercial Code. Basically, the Bank argued that because the terms of payment under the agreement were quarterly payments, and because a "quarterly" payment was due after two months rather than three, the agreement was invalid. However, the fact that one or more quarterly payments falls due at the end of a two rather than a three month period does not *per se* invalidate the nature of the purchase agreement. Simply stated, the Bank did not carry its burden of proof on this issue. *See Uniroyal, Inc. v. Michigan Bank, N.A.*, 12 UCC Rep.Serv. 745 (Mich.Circ.Ct.1972).

**5.** At all times pertinent hereto, the two SPA 816 vibratory finishing machines which generated the receivable in issue were identifiable as the two SPA 816 machines originally sold by Special Abrasives to Equico. This fact was confirmed in proceedings before the Honorable David H. Patton on Tuesday, October 14, 1980, wherein Mr. Thaddeus Bednarski, President of Special Abrasives, testified that the machines sold to General Electric were those that Equico repossessed from Special Abrasives.

**402**

Court opined that Special Abrasives had no equity in the escrowed funds, however, it retained jurisdiction to decide the dispute between Equico and the Bank.

■ Under Michigan law, it is clear that if the Bank authorized its debtor, Special Abrasives, to dispose of the collateral, the two SPA 816 vibratory finishing machines at issue, then Equico purchased the machines free and clear of the Bank's security interest in those machines.

Section 9–306(2) of the Michigan Uniform Commercial Code, M.C.L.A. § 440.9306(2) provides:

> (2) Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

The Official Comment on § 9–306, which appears at pages 380–382 of Volume 23 M.C.L.A., states in pertinent part:

> In many cases a purchaser or other transferee of collateral will take free of a security interest: in such cases the secured party's only right will be to proceeds. The transferee will take free whenever the disposition was authorized; the authorization may be contained in the security agreement or otherwise given. A claim to proceeds in a filed financing statement might be considered as impliedly authorizing sale or other disposition of the collateral, depending upon the circumstances of the parties, the nature of the collateral, the course of dealing of the parties and the usage of trade (see Section 1–205).

This section applies to, and protects, purchasers of inventory.[6] The first question therefore is whether the SPA 816 machines constitute "inventory" or "equipment."

These definitions are found at M.C.L.A. §§ 440.9109(2), (4).

The term "equipment" is defined as "[goods which] are used or bought for use primarily in business . . . or if the goods are not included in the definitions of inventory, farm products or consumer goods." M.C.L.A. § 440.9109(2). The term "inventory" is defined as:

> [Goods which] are held by a person who holds them for sale or lease or to be furnished under contracts of service or if he has so furnished them, or if they are raw materials, work in process or materials used or consumed in a business. Inventory of a person is not to be classified as his equipment.

M.C.L.A. § 440.9109(4). The facts of the present case indicate that the machines in question constitute inventory.

First, the UCC–1 financing statement specifically states that it covers "all inventory now owned or hereafter acquired . . . ." Second, the proceeds box of the financing statement is marked with an "x", emphasizing that the Bank is to look to the proceeds of such sales for its security. Third, the security agreement states that it covers inventory and proceeds. Finally, the testimony of the Bank corroborates our finding; Mr. Richard E. Ross testified that the Bank loaned the money to Special Abrasives so that the latter could purchase the materials needed to manufacture and sell the machines. Thus, the goods were inventory.

■ As to whether the Bank authorized Special Abrasives' disposition of the collateral, it is basic hornbook law that an explicit authorization cuts off the secured creditor's security interest. *Wabasso State Bank v. Caldwell Packing Co.,* 19 UCC Rep. Serv. 315 (Minn.Sup.Ct.1976); *Lisbon Bank & Trust Co. v. Murray v. Meier,* 12 UCC Rep.Serv. 356 (Iowa Sup.Ct.1973); *Universal C.I.T. Credit Corp. v. Middlesboro Motor Sales, Inc.,* 424 S.W.2d 409, 4 UCC Rep. Serv. 1126 (Ky.App.1968).

---

**6.** *See* 2 Hawkland, *A Transactional Guide to the Uniform Commercial Code,* 709 (1964) where it is said: "When credit is extended against the security of inventory, the lender knows or should know that the borrower usual-ly contemplates selling the encumbered goods in order to raise money to repay the loan." *See also* White & Summers, *Uniform Commercial Code* (2d Ed.1980).

At bar, the parties' security agreement makes no mention of consent prior to disposition. The only relevant paragraph of the agreement reads:

If Paragraph 2(B) hereof is checked: Until such time as the Bank shall notify Borrower of the revocation of such power and authority, Borrower (i) may, only in the ordinary course of its business, at its own expense, sell, lease or furnish under contracts of service any of the inventory normally held by Borrower for such purpose. . . . A sale in the ordinary course of business does not include a transfer in partial or total satisfaction of a debt.

Paragraph 6B of the July 1, 1975, Security Agreement. Paragraph 2B of the Agreement concerns inventory as collateral. This box is marked with an "x." The language is plain and unambiguous; there is no language for us to construe. The Bank authorized the sale by Special Abrasives to Equico.

The Bank alternatively argues that Equico was not a buyer in ordinary course for purposes of protection under M.C.L.A. § 440.9307(1). That statute reads:

A buyer in ordinary course of business (subsection (9) of section 1201) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

The term "buyer in ordinary course" is defined as "a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind. . . ." M.C.L.A. § 440.1201(9). The term "good faith" means "honesty in fact in the conduct or transaction concerned." M.C.L.A. § 440.1201(19).

■ At bar, Special Abrasives was in the business of manufacturing and selling SPA 816 vibratory finishing machines. Equico bought from "a person in the business of selling goods of that kind." Equico also bought in good faith. A buyer in ordinary course takes the goods free of a security interest therein, even if the buyer knows of the existence of the security interest, provided that the buyer does not know that the purchase violates the terms of the security agreement. *Tanbro Fabrics Corp. v. Deering Milliken, Inc.,* 39 N.Y.2d 632, 385 N.Y.S.2d 260, 350 N.E.2d 590, 19 UCC Rep. Serv. 385 (1976); *Massey-Ferguson, Inc. v. Helland,* 105 Ill.App.2d 648, 434 N.E.2d 295, 33 UCC Rep.Serv. 1532 (1982). Because the security agreement authorized the sale, Equico could not have violated, and did not violate, any term of the security agreement. Thus, Equico took the goods free of the Bank's security interest pursuant to M.C. L.A. § 440.9307(1).

The Bank further argues that even if it is not entitled to the SPA 816 vibratory finishing machines, it is at least entitled to the proceeds from the sale to General Electric.[7] The Bank correctly characterizes the monies that this Court ordered to be escrowed in the Merrill Lynch Ready Asset Trust account as proceeds. However, the Bank waived any security therein that it may have once possessed; consequently, it is estopped from asserting any interest therein.

■■ Estoppel arises where a party, by representations, admissions, or silence intentionally or negligently induces another to believe facts, and the other justifiably relies on and acts upon such belief such that the latter will be prejudiced if the former party is permitted to deny the existence of

---

**7.** In order for the Bank to argue entitlement to the proceeds from Specialty Finishing's sale to General Electric, the Bank must agree that at all times pertinent hereto, the two SPA 816 vibratory finishing machines which generated the proceeds were identifiable as the two SPA 816 machines originally sold by Special Abrasives to Equico Lessors. This fact was con- firmed in proceedings before the Honorable David H. Patton on Tuesday, October 14, 1980, wherein Thaddeus Bednarski, President of Special Abrasives, testified that the machines sold to General Electric were those that Equico repossessed from Special Abrasives. Transcript of proceedings at 23–32. *See* Note 5.

the facts. *Michigan National Bank of Detroit v. Kellam,* 107 Mich.App. 669, 309 N.W.2d 700 (1981), *app. den.,* 413 Mich. 870 (1982); *Johnson v. Harper-Grace Hospital,* 92 Mich.App. 202, 284 N.W.2d 520 (1979). Moreover, MCLA § 440.1103 provides:

> Unless displaced by the particular provisions of this act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

Finally, it is well accepted that the application of the doctrine of estoppel is best left to the discretion of the trial judge as it is he who is in the best position to weigh the interests of the litigants and the efficient administration of justice. *Howell v. Vito's Trucking & Excavating Co.,* 20 Mich.App. 140, 173 N.W.2d 777 (1969), *rev'd on other grounds,* 386 Mich. 37, 191 N.W.2d 313 (1970).

In *Planters Production Credit Association v. Bowles,* 256 Ark. 1063, 511 S.W.2d 645, 14 UCC Rep.Serv. 1435 (1974), the court held, in a case of first impression, that a secured creditor, whether perfected or unperfected, may waive his security interest in collateral in favor of a third party purchaser of the collateral simply by the secured creditor's course of dealing rather than by an express written waiver.

In *Bowles, supra,* the defendant borrowed a sum of money from plaintiff Planters Production Credit Association to finance his 1971 cotton, wheat and soybean corp. He pledged his 1971 crop, as well as certain farm equipment, as security for the loan. When Plaintiff refused to finance Bowles further, the latter sold his 1971 cotton crop but did not apply all of the proceeds to his obligation with plaintiff PCA: instead, Bowles delivered to a party who ginned the cotton and delivered it to another party. The proceeds were then used to reduce outstanding accounts receivable with a seed and chemical company.

The trial court granted summary judgment against Bowles, but found that PCA was not entitled to judgment against the third party purchaser defendants on the following grounds:

> "[T]he court expressly finds that the Plaintiff, Planters Production Credit Association, by its course of conduct through a number of years in regard to authorizing the Defendant, Charles W. Bowles, and all of its other borrowers to sell and otherwise dispose of crops which Bowles and the borrowers had produced and harvested receive the cash proceeds from the sale and dispose of same and to use such proceeds in such manner as the Defendant Bowles and other borrowers deemed proper, waived its lien under the financing statement and security agreement that the Plaintiff had taken from the Defendant, Charles W. Bowles, for the year 1971 and for the crops involved in this lawsuit. As a result of said waiver, all of these Defendants and Cross-Defendants except the wife of the Defendant, Jane C. Bowles, purchased such crops grown by the Defendant Bowles in 1971 free of the lien claimed by the Plaintiff or received the money from the sale of those 1971 crops free of any such lien."

*Bowles,* 257 Ark. 1063, 14 UCC Rep.Serv. at 1437 quoting transcript of trial court.

On appeal to the Arkansas Supreme Court, the court found that PCA's general practice was to permit its member-debtors, such as Bowles, to "sell or dispose of collateral at will, and relied on the member-debtor's honesty and integrity in applying the proceeds from such sale or disposition to the payment of his indebtedness to PCA." *Bowles,* 257 Ark. 1063, 14 UCC Rep.Serv. at 1440. The court then analyzed the question under the "or otherwise" clause of § 9–306(2) of the Arkansas Uniform Commercial Code, Ark.Stat.Ann. § 85–9–306(2) (Repl. 1961). The court essentially found the "or otherwise" clause to constitute waiver when inaction as to protection of security resulted:

> In the case at bar the secured party was an association composed of the debtor Bowles and approximately 365 other like

member-debtors of the association. The collateral was growing crops to be harvested and sold. PCA not only had a policy among all its member-debtors of permitting them to sell and dispose of collateral at will and be individually responsible to PCA in applying the proceeds of such sales to the loan indebtedness; PCA protected its membership identity from prospective purchasers of the members' products.

We conclude that under the facts and circumstances of this particular case, the chancellor's findings were not against the preponderance of the evidence, and the chancellor did not err in applying the law to the facts in this case.

*Bowles,* 257 Ark. 1063, 14 UCC Rep.Serv. at 1441.

■ As to the case at bar, we do not need to attempt an analysis of the "or otherwise" clause in M.C.L.A. § 440.9306(2); our facts are quite compelling.

First, the Bank did, by letter of September 27, 1978, subordinate its security interest in one SPA 816 vibratory finishing machine to that of Equico. Second, after default in the leases, Equico repossessed the machines and stored them at its own expense.[8] The Bank did not at any time assert, or attempt to assert, its security interest in the collateral.

Thereafter, Equico released two machines to Specialty Finishing Corporation, who then sold them to General Electric. Again, at no time did the Bank attempt to claim the machines from Equico; the Bank only asserted an interest when the sale to General Electric generated the receivable.

Mr. Richard E. Ross, Senior Vice President of the Bank, testified that the Bank knew throughout this two year period that Equico had repossessed and refurbished the machines. He also testified that it was the Bank's normal procedure to pay vendor payments, including storage charges, in order to protect collateral belonging to the Bank. This, it was testified to, only occurred when the Bank's collateral was repossessed by a third party. Here, however, the Bank sat idly by and did not follow its normal course of procedure.

The inescapable conclusion that is drawn from this course of events is that it would be inequitable to allow the Bank to now assert its claim to the proceeds. The Bank has waived any claim it had to the proceeds, and Equico detrimentally relied on the Bank's silence; therefore, Equico is entitled to the proceeds of the sale of the two SPA 816 machines, equalling $68,600 plus interest. IT IS SO ORDERED.

---

8. From July, 1979 through June, 1982, Equico incurred the following expenses as to the repossessed SPA 816 vibratory finishing machines: taxes, storage and transport of machines = $36,612.96; refurbishing of two machines sold to General Electric = $14,526.10; expenses, time and cost for Equico employees relating to storage, shipping, renovation and sale of machinery—200 hours at $25 per hour = $5,000. Total expenses = $56,139.06.