**WEST BAY EXPLORATION COMPANY, a Michigan corporation, Plaintiff–Appellant,**

v.

**AIG SPECIALTY AGENCIES OF TEXAS, INC., a Texas Corporation, formerly known as AIG Oil Rig of Texas, Inc., et al., Defendants,**

**International Surplus Lines Insurance Company, an Illinois corporation; Great Southern Fire Insurance Company, an Arizona corporation; Zurich American Insurance Company of Illinois, an Illinois corporation, Defendants–Appellees.**

No. 89–2252.

United States Court of Appeals, Sixth Circuit.

Argued July 30, 1990.

Decided Oct. 3, 1990.

Fiott & Asher, Southfield, Mich., for Intern. Surplus Lines Ins. Co.

Jon D. Vander Ploeg (argued), Brian J. Kilbane, Smith, Haughey, Rice & Roegge, Grand Rapids, Mich., for Great Southwest Fire Ins. Co.

Scott R. Melton, Gruel, Mills, Nims & Pylman, Grand Rapids, Mich., Robert J. Bates, Jr., Phelan, Peop & John, Chicago, Ill., Kirsten Kingdon, Peter B. Kupelian (argued), Tucker & Rolf, Southfield, Mich., for Zurich American Ins. Co. of Illinois.

Before MILBURN and GUY, Circuit Judges; and TIMBERS, Senior Circuit Judge.[*]

RALPH B. GUY, Jr., Circuit Judge.

The plaintiff, West Bay Exploration Company (West Bay), appeals entry of summary judgment in this diversity of citizenship contract action against three of its insurers: International Surplus Lines Insurance Company (International), Great Southwest Fire Insurance Company (Great Southwest), and Zurich American Insurance Company of Illinois (Zurich). West Bay argues that the district court erred in its interpretation of Michigan law and improperly resolved disputed issues of fact in holding that West Bay had failed to satisfy notice conditions contained in insurance policies written by the defendants. Upon *de novo* review of the record, we agree with the district court that the plaintiff has failed to raise a genuine issue of fact with regard to satisfaction of the notice requirements and, accordingly, affirm.

I.

West Bay is an independent oil and gas producer operating approximately 24 wells in northern lower Michigan. The defendants each issued general liability insurance policies covering the plaintiff's operations for the years 1982 through 1985.[1]

Craig W. Elhart (argued), Elhart & Power, Traverse City, Mich., for West Bay Exploration Co.

Robert E. Sullivan, Jr., Ronald S. Lederman (argued), Sullivan, Ward, Bone, Tyler,

---

[*] Honorable William H. Timbers, United States Court of Appeals for the Second Circuit, sitting by designation.

1. Zurich issued a comprehensive general liability policy to plaintiff effective from January 30, 1982, through January 30, 1983. That policy was renewed to cover the period from January 30, 1983, through January 30, 1984. Great Southwest issued a general liability policy to West Bay effective from January 30, 1984, through January 30, 1985. International issued a general liability policy to West Bay effective

This case arose from the defendants' denial of coverage for cleanup costs that the plaintiff incurred as a result of the discharge of toxic chemicals at seven of its natural gas wells during the covered period.

The discharges were the product of a procedure West Bay employs to remove water vapor from natural gas so that the gas can be conveyed through pipelines without freezing. West Bay processes the gas from its wells through a device known as a glycol dehydrator. In the dehydrator, the gas is mixed with glycol, a dessicant or drying agent, which absorbs the water vapor. The dry gas is then sent out through a pipeline and the glycol is reclaimed. The reclamation process involves heating the glycol to a temperature below its boiling point but above the boiling point of water, thus causing the water to escape in the form of steam. The glycol is then returned to the gas stream to absorb more water vapor, while the steam is sent through a "downpipe" where it condenses and is collected in a "drum" or "drip barrel." The water is discharged into a drip barrel rather than into the air because of the danger that it will carry trace amounts of the potentially carcinogenic aromatic hydrocarbons benzene, ethylbenzene, toluene, and xylene (BTEX). These toxins may appear naturally in water vapor from the wells.

In August 1984, the Michigan Department of Natural Resources (MDNR) prepared a report which revealed the presence of BTEX in "oil field associated water (brines) from all Michigan oil producing formations." The MDNR found that acceptable benzene levels had been exceeded by a factor of 3,500, making the aquifer that was tested "totally unsafe for human consumption" or even bathing.

Acting upon the information discovered in the August report, the MDNR obtained a warrant to search seven of West Bay's gas wells. The warrant was posted on October 31, 1985, and on that same date the MDNR sent West Bay a "Letter of Noncompliance" stating that the department had reason to believe that West Bay

had improperly disposed of glycol condensate and thereby unlawfully "committed waste in the development of oil," in violation of Michigan's Supervisor of Wells Act, 1939 P.A. 61, Mich.Comp.Laws § 319.4. The MDNR ordered West Bay to either replace a leaking drip barrel by November 11 or shut down the wells, and to take samples of the groundwater beneath the unsound barrel. The MDNR report indicates that at least one of West Bay's drip barrels had been intentionally perforated so as to allow collected water to seep into the ground.

On February 19, 1986, the MDNR wrote West Bay to inform the company that, due to the amount of BTEX that had seeped into the ground, corrective action would be required. The MDNR ordered West Bay to "remove contaminated soils in the vicinity of the dehydrator discharge point" and place them in a licensed landfill, replace the soils with clean backfill, install groundwater monitor wells, submit groundwater samples to an EPA approved laboratory, and regularly inspect the dehydrator collection vessel. The letter specified that these actions were to be coordinated with the MDNR and performed within 40 days.

West Bay called in specialists to determine the extent of the groundwater contamination and began corrective action in accordance with the MDNR requests. On June 19, 1986, approximately seven months after the MDNR had posted search warrants on its wells, the plaintiff's attorney, Craig Elhart, mailed a letter to West Bay's insurance agent, James Patrick Quirk, in which he explained that West Bay's dehydrators had released toxic chemicals into the ground and that the company had already incurred and would continue to incur a great deal of expense in cleaning up the seepage. Elhart wrote that West Bay "hereby make(s) claim for cleanup" and suggested that Quirk contact West Bay's president and majority shareholder, Robert Tucker.

Immediately upon receipt of the letter, Quirk telephoned Tucker. According to his

from January 30, 1985, through January 30, 1986.

deposition testimony, Quirk explained that he "didn't think that the policies [were] intended to cover this type of problem, because my understanding of the definition of the pollution coverage had the term 'sudden and accidental' as a limitation." Quirk also advised Tucker that "it was my opinion that all he would do by turning in a possible claim would be to, in effect, make my securing renewal insurance premiums much more difficult and much more expensive." Quirk stated that Tucker agreed with this assessment, did not think that the pollution would present a major problem, and agreed that West Bay should not pursue a claim. After this conversation, Quirk sent Elhart a letter dated June 24, stating, in pertinent part, as follows:

> It is my opinion that both policies definitely deny coverage to pollution and contamination and clean up from other than a sudden accidental and unintended occurrence.

> Robert Tucker stated that he did not think the problem was going to be of great magnitude, and does not want to try to turn in a claim at this time.

Neither West Bay nor Quirk ever submitted a claim to any of the defendants. After Tucker's consultation with Quirk, West Bay continued to expend considerable sums in its effort to clean up the well site in compliance with MDNR orders, paying consultants, removing contaminated soil from the vicinity of the dehydrator discharge, disposing of contaminated groundwater, backfilling the contaminated area with clean soil, and installing groundwater monitor wells. West Bay also removed the barrels from which the discharge had apparently leaked and replaced them with a new collection system.

On October 27, 1987, approximately two years after receiving the letter of noncompliance from the MDNR, West Bay commenced this action in the United States District Court for the Western District of Michigan seeking a declaratory judgment of liability against International and various other insurance companies no longer parties to this action.[2] West Bay sought to have the defendants declared jointly and severally liable for costs West Bay had incurred as a result of the BTEX discharge. On July 7, 1988, West Bay amended its complaint to add Southwest and Zurich as defendants. In addition to the claims for declaratory judgment, the plaintiff's amended complaint requested damages alleging breach of contract by each defendant and negligence for failure to provide an insurance contract free from ambiguity.

In June 1989, the three defendants each filed motions for summary judgment, arguing that the plaintiff had failed to satisfy a condition precedent to their duty under the insurance contracts by not notifying them of the facts underlying the claim "as soon as practicable," and that, in any event, various provisions within the policies excluded coverage for costs associated with the clean up.[3] West Bay argued in response that it had satisfied the notice conditions in June of 1986 by filing a claim with Quirk. West Bay further contended that even if it had failed to provide notice until it filed the complaint in the instant action, the defendants had not been prejudiced thereby, so that the failure could not stand as a bar to recovery.

The district court granted summary judgment in favor of all three defendants. After determining that Quirk was an agent of West Bay rather than of its insurers, the court held that notice to Quirk could not substitute for notice to the defendants. The court then explained that the plaintiff's two-year delay in notifying International and its nearly three-year delay in notifying Southwest and Zurich had resulted in prej-

---

2. The other insurance carriers had issued different classes of coverage (e.g., cost of control, umbrella policies) during the relevant periods. These defendants were dismissed by joint motion and stipulation.

3. The defendants argued that their policies provided no coverage for the toxic emissions because, *inter alia*, (1) the claim was not based upon "property damage" as defined in the policies; (2) the emissions at the well sites did not qualify as "occurrences" within the meaning of the policies; (3) coverage was barred under the policies' pollution exclusions; and (4) coverage was barred by the policies' exclusion for damage to property owned by the insured.

udice to all three defendants. Accordingly, the court held that West Bay had not satisfied the notice conditions of its policies and therefore could not collect on them. Finally, the court granted summary judgment in favor of three defendants on the remaining negligence and breach of contract claims.

The plaintiff filed this appeal contesting only the district court's grant of summary judgment on the declaratory judgment claim.

## II.

Summary judgment is appropriate only where "the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial." *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987); Fed.R.Civ.P. 56(c). In examining the record to determine whether a genuine issue of material fact exists, the district court must review all evidence in the light most favorable to the nonmoving party, and "all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986).

A party bearing the burden of proof at trial may not evade its obligation to adduce evidence by "simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355 (citations omitted). As the Supreme Court explained in *Liberty Lobby,* a dispute about a material fact is "genuine" within the meaning of Rule 56 only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." 477 U.S. at 248, 106 S.Ct. at 2510.

This court reviews a district court's grant of summary judgment *de novo, McKee v. Cutter Laboratories, Inc.,* 866 F.2d 219, 220 (6th Cir.1989); *Storer Communications, Inc. v. National Ass'n of Broadcast Employees & Technicians,* *AFL–CIO,* 854 F.2d 144, 146 (6th Cir.1988), albeit with the understanding that "the judgment of a local district judge sitting in a diversity case, as to the application of state law, is entitled to considerable deference." *Diggs v. Pepsi–Cola Metro. Bottling Co.,* 861 F.2d 914, 927 (6th Cir.1988) (citations omitted).

In deciding the questions presented, we follow the law of Michigan as announced by that state's supreme court. *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Where the state supreme court has not spoken, our task is to discern, from all available sources, how that court would respond if confronted with the issue. *Bailey v. V & O Press Co.,* 770 F.2d 601, 604 (6th Cir.1985).

Our inquiry begins with an examination of the terms of the policies. *See Jones v. Farm Bureau Mutual Ins. Co.,* 172 Mich. App. 24, 27, 431 N.W.2d 242 (1988). The notice provisions contained in the three policies are substantially identical, each providing in relevant part as follows:

> In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.
>
> . . . .
>
> No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy

. . . .

The terms of the policies require that notice be provided to an "authorized agent[ ]" of the defendant, and that the notice be provided "as soon as practicable." Our review of the record convinces us that the plaintiff satisfied neither of these requirements as they are construed under Michigan law.

## A. Notice to Pat Quirk

 West Bay's contention[4] that its communications with Pat Quirk in June of 1986 constituted notice within the meaning of the policies must yield to the incontrovertible fact that Pat Quirk was not an "authorized agent" of the defendants.[5] In order for a person to become the agent of a principal under Michigan law, the principal must have acted in such a way as to confer authority, whether actual or apparent, on the prospective agent. *Central Wholesale Co. v. Sefa*, 351 Mich. 17, 87 N.W.2d 94 (1957); *Grossman v. Langer*, 269 Mich. 506, 510, 257 N.W. 875 (1934); *Michigan Nat'l Bank v. Kellam*, 107 Mich.App. 669, 679, 309 N.W.2d 700 (1981); *Smith v. Saginaw Savings & Loan*, 94 Mich.App. 263, 271, 288 N.W.2d 613 (1979); *United States v. Marroso*, 250 F.Supp. 27, 30 (E.D.Mich. 1966) (Michigan law) ("[A] person may not merely by his own words or conduct make himself another's agent."); *see also* RESTATEMENT (SECOND) OF AGENCY §§ 1, 26. As a brief canvass of the facts shows, none of the defendants has ever taken any action to confer actual or apparent authority on Pat Quirk, who was at all times and by all parties understood to be the agent of West Bay alone.[6]

Since approximately 1980, Quirk has been an independent insurance agent operating out of San Antonio, Texas, and conducting business as Pat Quirk Insurance. He became involved with West Bay through his lifelong friendship with Robert Tucker whose personal insurance needs he has handled for approximately twenty years. Quirk has been, at all times relevant to this appeal, a major investor in West Bay, and has owned up to 14 percent of the company. He has also maintained familiarity with West Bay's operations on a "day to day basis." In deposition testimony, Quirk stated that West Bay authorized him to make all insurance decisions for the company. As Quirk described the relationship: "West Bay left it entirely up to me. And as one of the major investors, you know, I took care of them like I would my family."

Quirk procured the three insurance policies at issue here through independent surplus line brokerage firms. Describing the procedure he employed, Quirk explained that he would contact several brokerage firms, inquire as to the terms and prices of policies available, and "try to secure the best pricing as well as the best-rated companies that would write the coverage West Bay needed."

Quirk never dealt directly with any of the defendants. His only contacts with them were through fully independent surplus brokerage firms. When paying for policies, West Bay would pay Quirk who, in turn, would pay the surplus broker. The broker would then pay the insurance company. All of Quirk's commissions were paid directly by West Bay.

In deposition testimony, Quirk admitted that none of the defendant companies had

---

**4.** We note that the plaintiff conceded the weakness of his position on the issue of notice at oral argument. As the question was the subject of much debate in the briefs, however, we will address it fully here.

**5.** In Michigan, "[t]he general rule of insurance law is that the knowledge of, or notice to, an insurance agent as to a matter within the scope of his authority, and which is acquired while the agent is acting within the scope of his authority, is chargeable to an insurer." *Wendel v. Swanberg*, 384 Mich. 468, 478 n. 7, 185 N.W.2d 348 (1971) (citing *Hawkeye Casualty Co. v. Holcomb*, 302 Mich. 591, 5 N.W.2d 477 (1942)); *see also* Mich.Comp.Laws § 500.3008. The terms of each insurance policy are consistent with this rule, and we interpret the term "authorized agent" as it appears in the policies with this statutory requirement in mind.

**6.** The Michigan courts have not announced a specific method for determining whether an insurance agent is an agent of the insurer or the insured. In *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 264–65 (7th Cir.1986), the Seventh Circuit employed a four-part test to answer this question under Illinois law. As restated in *American Insurance Corp. v. Sederes*, 807 F.2d 1402, 1405 (7th Cir.1986), the test asks: "(1) who put the agent in motion; (2) who controls the agent's actions; (3) who pays the agent, and (4) whose interest does the agent represent." (citing *Lazzara*, 802 F.2d at 264) (footnote omitted). As illustrated below, Quirk would clearly be regarded as an agent of West Bay under this test as well.

ever authorized him to act on their behalf and that none of the defendants had ever delegated to him the authority to deny coverage on a policy. Quirk stated that he never personally believed that he had such authority; in fact, he stated that he could not act in such a capacity because he is not licensed with the Texas State Board of Insurance as an agent of any of the defendant insurance companies. There is no evidence that any of the defendants ever took any action that would have led any of West Bay's employees to believe that Quirk was operating as one of their agents.

The plaintiff nevertheless contends that a genuine issue of fact exists as to whether an agency relationship existed because Pat Quirk's signature appears above lines designated "Authorized Representative" on each of the policies.[7] As noted above, a principal may not be bound by the actions of another without the principal's consent. Pat Quirk could not make himself the authorized representative of the defendants by simply signing the policies in question without the authorization or even knowledge of the defendants. Accordingly, we agree with the district court that Quirk was not an authorized agent of any of the defendants and that notice to him could not, therefore, constitute notice within the meaning of the policies.

■ Even if we were to find that Quirk acted as an agent of the defendants, we would still not agree that the June 1986 communications between Quirk, Elhart, and Tucker constituted notice of an occurrence within the meaning of the policies. The letter from Quirk to Elhart dated June 24 reveals that Tucker agreed with Quirk that to turn in a claim at that time would likely cost more in increased premiums

than it would yield in coverage. The substance of the letter is confirmed by Quirk's deposition testimony and is not contradicted anywhere on the record. It is apparent, therefore, that Tucker, as president of West Bay, decided not to file a claim in June of 1986 and communicated this information to Quirk.

Accordingly, we agree with the district court that West Bay's communications with Quirk in June of 1986 did not constitute notice within the meaning of the policies. We turn now to the plaintiff's argument that its failure to provide timely notice does not bar recovery on the policies because it caused the defendants no prejudice.

**B. Prejudice Due to Untimely Notice**

■ Under Michigan law, late notice to an insurance company will not eliminate an insurer's obligations under a policy unless the insurer can demonstrate that it has been prejudiced by the delay.[8] *Wendel v. Swanberg*, 384 Mich. 468, 478, 185 N.W.2d 348 (1971); *Wehner v. Foster*, 331 Mich. 113, 117, 49 N.W.2d 87 (1951); *Weller v. Cummins*, 330 Mich. 286, 292–93, 47 N.W.2d 612 (1951); *Kennedy v. Dashner*, 319 Mich. 491, 30 N.W.2d 46 (1947); *Wood v. Duckworth*, 156 Mich.App. 160, 401 N.W.2d 258 (1986); *Burgess v. American Fidelity Fire Ins. Co.*, 107 Mich.App. 625, 310 N.W.2d 23 (1981).

The burden of showing prejudice rests upon the insurer. *Wendel*, 384 Mich. at 478, 185 N.W.2d 348; *Wehner*, 331 Mich. at 117, 49 N.W.2d 87; *Burgess*, 107 Mich.App. at 628, 310 N.W.2d 23; *Steelcase, Inc. v. American Motorists Ins. Co.*, No. 89–1344, slip op. at 5 (6th Cir. July 3, 1990) [907 F.2d 151 (Table) ] (unpublished per curiam). Prejudice will be found where the delay

---

7. We note that there is a substantial question as to whether this is in fact the case. On the Zurich policy, the name "Quirk & Company" is typed above the signature lines reading "Authorized Representative" or "Duly authorized agent." In addition, the signature, while illegible, appears not to be that of Pat Quirk.

8. The Michigan courts have developed this rule through an inquiry into the purpose of notice provisions. As the Michigan Supreme Court wrote in *Wendel v. Swanberg*, 384 Mich. 468,

477, 185 N.W.2d 348 (1971), these provisions "allow the insurer to make a timely investigation of the accident in order to evaluate claims and to defend against fraudulent, invalid, or excessive claims." (Citations omitted). *See also Wehner v. Foster*, 331 Mich. 113, 119, 49 N.W.2d 87 (1951) (stating that the purpose of the provision is "to give the insurer an opportunity to investigate the facts and circumstances affecting the question of liability and the extent of such liability.").

"materially" impairs an insurer's ability to contest its liability to an insured or the liability of the insured to a third party. *Wendel*, 384 Mich. at 479, 185 N.W.2d 384; *Burgess*, 107 Mich.App. at 630, 310 N.W.2d 23; *Anderson v. Kemper Ins. Co.*, 128 Mich.App. 249, 254, 340 N.W.2d 87 (1983) (defendants must show "they have been materially injured in their ability to contest the merits of the case. . . ."). Michigan law does *not* require an insurer to prove that but for the delay it would have avoided liability. *Steelcase*, 907 F.2d 151 (explaining that this circuit misstated Michigan law when we announced the "but for" test in *Stonewall Ins. Co. v. Webb*, 746 F.2d 1479 (6th Cir.1984) (unpublished per curiam)).

■ While the question of prejudice is generally to be left to the trier of fact, *Wendel*, 384 Mich. at 478 n. 8, 185 N.W.2d 384, where the facts are so clear that "one conclusion only is reasonably possible," the question is one of law. *Wehner*, 331 Mich. at 120, 49 N.W.2d 87 (citation omitted) (trial court erred in submitting the question to the jury); *Wendel*, 384 Mich. at 479, 185 N.W.2d 384; *Wood*, 156 Mich.App. 160, 401 N.W.2d 258. Under the circumstances of this case, we believe that the district court reached the only reasonable conclusion in finding prejudice as a matter of law.

The defendants have been most obviously prejudiced by West Bay's failure to notify them before disposing of the drip barrels from which the BTEX escaped. Each of the three policies includes an identical "pollution exclusion" which excludes from coverage:

> bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutant into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*

(Emphasis added). If this action were to proceed to trial, the defendants could escape liability under this provision only by showing that the discharge of BTEX occurred either gradually or intentionally. *See FL Aerospace v. Aetna Casualty & Sur. Co.*, 897 F.2d 214, 219–20 (6th Cir. 1990) (Michigan law); *Grant–Southern Iron & Metal Co. v. CNA Ins. Co.*, 905 F.2d 954, 955 (6th Cir.1990) (Michigan law) ("the phrase 'sudden and accidental' has a temporal component and does not describe continuous or ongoing polluting events.") Both showings could best be made by presenting evidence of the condition of the discharge barrels at the time the discharge was discovered. If the MDNR report is accurate, and at least one of the barrels was perforated, the defendants would make out a powerful case that the discharge was both intentional and gradual. By destroying the drip barrels in its clean-up effort, West Bay has materially compromised the defendants' ability to present their most powerful defense to liability under the policy.

In addition, we agree with the district court that, through its lengthy delay, West Bay left the defendants "without the option of suggesting, or even mandating, the use of less costly, more efficient procedure[s] in responding to [M]DNR's request for cleanup." While it is true that the insurers have not presented evidence that they would have developed a less costly method of responding to the MDNR's orders, we feel that this is a case in which " 'the lapse of time which removes the opportunity for prompt investigation, also destroys the possibility of showing prejudice arising from delayed inquiry.' " *Wehner*, 331 Mich. at 120, 49 N.W.2d 87 (quoting *Purefoy v. Pacific Automobile Indem. Exchange*, 5 Cal.2d 81, 53 P.2d 155 (1935)). To require the defendants to make an accounting of the money they might have saved had these two and three-year delays not taken place would be to allow the plaintiff to profit from the length of the delay. The Michigan courts have recognized that where enough time has passed, "it virtually becomes impossible to learn what facts, favorable to defendant, could have been ascertained through prompt inquiry." In such situations, the Michigan courts have

been "impelled to the conclusion that prejudice must be presumed...." *Id.*

The plaintiff has accurately noted a general reluctance on the part of the Michigan courts to allow insurers to escape liability due to notice provisions. The cases cited, however, all involve attempts by injured parties to recover in garnishment proceedings against an insurer of a principal defendant. Under these circumstances, the Michigan courts have proceeded with sensitivity to the equities of the cases before them. As the court of appeals stated in *Burgess:*

> In most instances, the practical effect of a ruling in favor of the insurance carrier in a garnishment action leaves the injured plaintiff with an uncollectible judgment, while fairness also dictates that the insurance carrier must not be deprived of an opportunity to protect its interests where it has no notice. Erosion of rights of the insurance carrier adds to the costs of doing business. There exists a delicate balancing of these respective social interests.
>
> Insurance companies are professionals in the arena of litigation. Hence, evolution of the concept that the insurance carrier must show prejudice from the lack of notice of accident or suit before it will not be required to respond.

107 Mich.App. at 629–30, 310 N.W.2d 23; *see also Wood,* 156 Mich.App. at 164, 401 N.W.2d 258. The need for delicate balancing of the equities to avoid injury to an innocent third party is absent from this case. Here, the plaintiff delayed making a claim on its policies with the expressed intention of avoiding an increase in its insurance premiums. Having acted in its own financial interest, it cannot now complain because it has been injured thereby.

We find that the delays of two and three years materially prejudiced the defendants and therefore operate to relieve them of any liability on their policies of insurance. Summary judgment for the defendants is AFFIRMED.